**NOT YET SCHEDULED FOR ORAL ARGUMENT**
**No. 12-5411**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**GROSSMONT HOSPITAL CORPORATION, Doing Business as Sharp
Grossmont Hospital,** *et al.,*
*Plaintiffs-Appellants,*

**v.**

**SYLVIA MATHEWS BURWELL, Secretary,**[1]
**Department of Health and Human Services,**
*Defendant-Appellee.*

*On Appeal from the United States District Court
for the District of Columbia
Civil Action No. 1:10-CV-01201-RLW*

## BRIEF FOR THE APPELLANTS

ROBERT L. ROTH
HOOPER, LUNDY & BOOKMAN, P.C.
401 9th Street, N.W., Suite 550
Washington, D.C.  20004-2141
Tel.: (202) 580-7701
Fax: (202) 580-7719
Email:  rroth@health-law.com

JOHN R. HELLOW
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California  90067
Tel:  (310) 551-8155
Fax:  (310) 551-8181
Email:  jhellow@health-law.com
***Attorneys for Appellants***

---

[1] Sylvia Mathews Burwell has been substituted for Kathleen Sebelius in accordance with Federal Rule of Appellate Procedure 43(c).

1

## <u>CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES</u>

Pursuant to Circuit Rule 28(a)(1), Plaintiffs-Appellants Grossmont Hospital Corporation (doing business as Sharp Grossmont Hospital), Sharp HealthCare, Sharp Chula Vista Medical Center, Sharp Memorial Hospital (successor-in-interest to Sharp Cabrillo Hospital), and Tri-City Healthcare District (on behalf of Tri-City Medical Center) (collectively "the Appellants"), by and through their undersigned counsel, hereby certify the following as to Parties, Rulings, and Related Cases:

A.     **<u>Parties</u>**

Pursuant to Circuit Rule 26.1, the undersigned certifies that, of the five Appellants, all of which were plaintiffs below and all of which are nonprofit hospitals that participate in the Medicare program:  for three -- Grossmont Hospital Corporation (doing business as Sharp Grossmont Hospital), Sharp Chula Vista Medical Center, and Sharp Memorial Hospital (successor-in-interest to Sharp Cabrillo Hospital) -- Sharp HealthCare (also a nonprofit entity) is the parent corporation; the fourth, Sharp HealthCare, has no parent corporation; and the fifth, Tri-City Healthcare District, is a government-run hospital.  There are (a) no other parent companies of any Appellant and (b) no publicly held company that has a 10% or greater ownership interest in any Appellant.

Appellee, defendant below, is the Secretary of the United States Department of Health and Human Services, currently Sylvia Mathews Burwell.

i

There are no intervenors or *amici curiae* currently in this action in this Court. However, in the District Court, Catholic Healthcare West appeared as an *amicus curiae*.

B.  **Ruling Under Review**.

Appellants seek review of the Memorandum Opinion and Order entered in *Grossmont Hospital Corp, et al., v. Sebelius*, 903 F. Supp. 2d 39 (D.D.C. 2012), by the Honorable Robert L. Wilkins, on November 9, 2012, ECF Nos. 39 and 40.

C.  **Related Cases.**

The case on review was before the United States District Court for the District of Columbia, under Civil Action No. 10-01201 (RLW). The case was not previously before this Court or any other court. Counsel for Appellants is not aware of any other related cases "involving substantially the same parties and the same or similar issues," as defined in Circuit Rule 28(a) (1) (C).

Respectfully submitted,

Dated:  June 26, 2014                    _____/s/ Robert L. Roth_____
                                        Robert L. Roth (D.C. Bar No. 441803)
                                        HOOPER, LUNDY & BOOKMAN, P.C.
                                        401 9th Street, N.W., Suite 550
                                        Washington, D.C.  20004-2141
                                        Tel:  (20 2) 580-7701
                                        Fax:  (202) 580-7719
                                        Email:  rroth@health-law.com

ii

John R. Hellow
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California  90067
Tel:  (310) 551-8155
Fax:  (310) 551-8181
Email:  jhellow@health-law.com

Attorneys of Record for Appellants
Grossmont Hospital Corporation, *et al.*

## TABLE OF CONTENTS                                    Page

I.      STATEMENT OF JURISDICTION.................................................................1

II.     ISSUES PRESENTED FOR REVIEW ............................................................1

III.    STATUTES AND REGULATIONS INVOLVED .........................................3

IV.     STATEMENT OF THE CASE........................................................................3

V.      STATEMENT OF FACTS AND PRIOR PROCEEDINGS .........................9

        A.      General Background of the Medicare and Medicaid Programs.............9

        B.      Notice and Comment Rulemaking Required Under Medicare.............10

        C.      The Medicare Hospital Payment System..............................................11

        D.      The Medicare Appeals Process............................................................11

        E.      Payment for Medicare Bad Debts........................................................12

        F.      Medi-Cal's Payment of Medicare Copayments for Dually-Eligibles...................20

        G.      Relevant Congressional Action............................................................22

        H.      The Secretary and Medi-Cal Agreed on a Process to Address Medicare
                Bad Debts Arising from May 1, 1994 through April 4, 1999...............23

        I.      The Lump-Sum Payment Claims Correction Process ..........................24

        J.      The Hospitals Determined that the Lump-Sum Payments Were Incomplete
                and Would Not be Corrected Through the Lump-Sum Process. ..........25

        K.      The Hospitals' Accurate Identification of the Amounts Due for the
                Medicare Bad Debts at Issue...............................................................29

        L.      During the Entire Period at Issue, Medicare Automatically Crossed-Over
                Dually-Eligible Claims to Medi-Cal. ..................................................32

        M.      Prior Proceedings ...............................................................................33

VI.     STANDARD OF REVIEW ...........................................................................35

VII.    SUMMARY OF THE ARGUMENT .............................................................37

VIII.   ARGUMENT .................................................................................................39

**TABLE OF CONTENTS**                                                   **Page**

A.    The "Mandatory State Determination" Policy is Inconsistent With the Secretary's Rules, Violates the Statutory Bad Debt Moratorium, and  is Otherwise Unlawful. ........................................................................................39

B.    The Secretary's Refusal to Pay the Hospitals' Claims Based on the "Mandatory State Determination" Policy Is Arbitrary and Capricious, Not Based On Substantial Evidence, and Otherwise Unlawful Under the APA. .........49

2.    The Hospitals Used the Same Methodology that the Secretary Used to Determine the Payment Due on the Lump-Sum Claims.......................................52

C.    The Hospitals' Claims Must be Paid Under JSM-370...........................................54

D.    The District Court Erred By Refusing to Consider the Hospitals' Argument that the "Mandatory State Determination" Policy Violates the Bad Debt Moratorium. ...........................................................................................55

IX.    CONCLUSION.................................................................................................57

## TABLE OF AUTHORITIES                                    Page(s)

C<small>ASES</small>

*Alaska Professional Hunters Association, Inc. v. FAA,*
    177 F.3d 1030 (D.C. Cir. 1999) ............................................................49, 55

*Beverly Cmty Hosp. Association v. Belshe,*
    132 F.3d 1259 (9th Cir. 1997) ....................................................................23

*Beverly Cmty Hosp. v. Belshe,*
    No. 95-4053, 1995 WL 80520 (C.D. Cal. Dec. 19, 1995)..................21, 22

*Biloxi Regional Medical Center v. Bowen,*
    835 F.2d 345 (D.C. Cir. 1987) ....................................................................36

*Bowen v. Georgetown University Hospital,*
    488 U.S. 204 (1988)....................................8, 11, 39, 40, 45, 46, 49, 55

*Brown v. Bowen,*
    794 F.2d 703 (D.C. Cir. 1986) ....................................................................36

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984)................................................................................36, 48

*Christensen v. Harris County,*
    529 U.S. 576 (2000)......................................................................................36

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971).......................................................................................35

*Community Hospital of the Monterey Peninsula v. Thompson,*
    323 F.3d 782 (9th Cir. 2003) ...........................................18, 19, 43, 49

*Foothill Hospital – Morris L. Johnston Memorial v. Leavitt,*
    558 F. Supp. 2d 1 (D.D.C. 2008) ............................................................6, 15

*Grossmont Hospital Corp., et al. v. Sebelius,*
    903 F. Supp. 2d 39 (D.D.C. 2012) .............................................34, 35, 52, 56

*Harris County Hospital District v. Shalala,*
    64 F.3d 220 .............................................................................................48, 57

*Hormel v. Helvering,*
    312 U.S. 552 (1941)........................................................................................57

*  Authorities chiefly relied on are marked with an asterisk.

## TABLE OF AUTHORITIES                                   Page(s)

*Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*,
    448 U.S. 607 (1980) ................................................................ 36

*Memorial, Inc. v. Harris*,
    655 F.2d 905 (9th Cir. 1980) .................................................. 36

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm*
    *Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983) ............................................................ 35, 36

*National Treasury Employees Union v. FLRA*,
    399 F.3d 334 (D.C. Cir. 2005) ............................................... 37

*Pub. Citizen, Inc. v. HHS.*,
    332 F.3d 654 (D.C. Cir. 2003) ............................................... 35

*Schering Corp. v. Illinois Antibiotics Co.*,
    89 F.3d 357 (7th Cir. 1996) .................................................... 56

*\*Summer Hill Nursing LLC v. Sebelius*,
    603 F. Supp. 2d 35 (D.D.C. 2009) ......................................... 48

*U.S. Telecom Ass'n v. FCC*,
    227 F.3d 450 ........................................................................... 37

**STATUTES**

*5 U.S.C. §706 ........................................................................... 35

28 U.S.C. §1291 .......................................................................... 1

28 U.S.C. §1331 .......................................................................... 1

42 U.S.C. § 1395f (1992) ........................................................... 15

42 U.S.C. §1395f(b)(1) ............................................................. 11

42 U.S.C. §1395h ........................................................................ 9

42 U.S.C. §1395hh(a)(1) ........................................................... 10

*42 U.S.C. §1395hh(a)(2) ............................... 8, 10, 11, 39, 40, 49

42 U.S.C. §1395oo ..................................................................... 11

42 U.S.C. §1395oo(f) ...................................................... 1, 12, 35

42 U.S.C. §1395oo(f)(1) ............................................................ 12

iv

## <u>TABLE OF AUTHORITIES</u>                                          <u>Page(s)</u>

42 U.S.C. §1395ww(d) ........................................................................................11

42 U.S.C. §1395x(v)(1)(A) ...............................................................................12

*42 U.S.C. §1395x(v)(1)(A)(i) ...........................................................................3

42 U.S.C. §1396a(a) ..........................................................................................10

42 U.S.C. §1396a(b) ..........................................................................................10

42 U.S.C. §1396a(n) ..........................................................................................22

42 U.S.C. §1396b ..............................................................................................10

Balanced Budget Act of 1997, Pub.L.No. 105-33 ............................................4, 22,23

*Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100-203, sec. 4008(c), 101 Stat. 1330-55 .......................................................................................14

 *Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101-239, sec. 6023, 103 Stat. 2176 ..............................................................................................15

*Technical Miscellaneous Revenue Act of 1988, Pub.L. No. 100-647, sec. 8402, 102 Stat. 3798 ...........................................................................................14

**REGULATIONS**

42 C.F.R. §405.1851 ..........................................................................................42

42 C.F.R. §§405.1875 ........................................................................................12

42 C.F.R. §405.1877 ..........................................................................................12

42 C.F.R. §412.89(d) ..........................................................................................3,12

42 C.F.R. §413.80 ................................................................................................3

*42 C.F.R. §413.89(d) ..........................................................................................3

42 C.F.R. §413.89(e)(2) ......................................................................................12

42 C.F.R. §413.89(e)(3) ......................................................................................12

Joint Signature Memorandum 370........................................................................19, 54

**OTHER AUTHORITIES**

Provider Reimbursement Manual Part I ("PRM"),  §310 ....................................13, 41

## TABLE OF AUTHORITIES                                    Page(s)

Provider Reimbursement Manual Part I ("PRM), §312.................................................... 13-15, 41

Provider Reimbursement Manual Part I ("PRM), §322.................................................13, 33, 40, 41

Provider Reimbursement Manual, Part II ("PRM-II") §1102.3L
.................................................................................. 6, 12-16, 17,19, 42-45, 47- 49, 54-56

*California Hospitals 90-91 Outpatient Crossover Bad Debts Group v. Blue Cross
and Blue Shield Association/Blue Cross of California/Mutual of Omaha/Aetna
Life Insurance Company,* Adm. Dec. (Oct. 31, 2000) ...........................................17, 33, 34,43

*California Hospitals Outpatient Crossover Bad Debts Group Appeal v. Blue
Cross of California/Mutual of Omaha/Aetna Life Insurance Company,*
PRRB Decision. 2000-D80 (Sept. 6, 2000) ...........................................................17, 18, 43, 44

*Concourse Nursing Home v. Travelers Ins. Co.,*
PRRB Dec. No. 83-D152 (Sept. 27, 1983) ...........................................................................46

*SD 94/95/96-97 Inpatient Crossover Bad Debts Groups/Sharp HC 97 Inpatient
Unproc. Crossover Bad Debts Group, San Diego County, California, v.
BlueCross BlueShield Association/National Government Services, Inc.,*
CMS Administrator Decision (May 17, 2010)
............................................................6, 15, 23, 25-27, 29, 31-33, 38, 40, 50-54, 56

*\*SD 94/95/96-97 Inpatient Crossover Bad Debts Groups/Sharp HC 97 Inpatient
Unproc. Crossover Bad Debts Group, San Diego County, California, v.
BlueCross BlueShield Association/National Government Services, Inc.,*
PRRB Decision (March 18, 2010) ...............................................................................5, 31, 32

*St. Joseph Hosp. v. Blue Cross & Blue Shield Assoc./Blue Cross of
Georgia/Columbus, Inc.,*
PRRB Dec. No. 84-D109 (Apr. 16, 1984) ...........................................................................46

*Trispan Health Services,* Admin. Dec. No. 2007 D8, *reported at* 2007 WL
1004392, at *7................................................................................................................46

# GLOSSARY OF ABBREVIATIONS AND ACRONYMS

| | | |
|---|---|---|
| APA | -- | Administrative Procedure Act |
| AR | -- | Administrative Record |
| BBA | -- | Balanced Budget Act of 1997 |
| BCBSA | -- | Blue Cross Blue Shield Association |
| Board | -- | Provider Reimbursement Review Board |
| CMS | -- | Centers for Medicare & Medicaid Services |
| DSH | -- | Medicare Disproportionate Share Hospital |
| FY | -- | Fiscal Year |
| Hosps.' Init. Mem. | -- | Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment [Dkt16] |
| Hosps.' Reply Mem. | -- | Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment [Dkt20] |
| NPR | -- | Notice of Program Reimbursement |
| OBRA-87 | -- | Omnibus Budget Reconciliation Act of 1987 |
| PPS | -- | Prospective Payment System |
| PRRB | -- | Provider Reimbursement Review Board |

| | | |
|---|---|---|
| PRRB Decision | -- | *SD 94/95/96-97 Inpatient Crossover Bad Debts Groups/Sharp HC 97 Inpatient Unproc. Crossover Bad Debts Group, San Diego County, California, v. BlueCross BlueShield Association/National Government Services, Inc*., PRRB Decision (March 18, 2010) |
| PRM-I | -- | Medicare Provider Reimbursement Manual, Part I |
| PRM-II | -- | Medicare Provider Reimbursement Manual, Part II |
| PS&R | -- | Medicare Provider Statistical & Reimbursement File |
| Secretary | -- | Secretary of the United States Department of Health & Human Services |
| Sec. Dec. | -- | *SD 94/95/96-97 Inpatient Crossover Bad Debts Groups/Sharp HC 97 Inpatient Unproc. Crossover Bad Debts Group, San Diego County, California, v. BlueCross BlueShield Association/National Government Services, Inc*., CMS Administrator Decision (May 17, 2010) |
| Sec.'s Init. Mem. | -- | Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment [Dkt.18] |
| Sec.'s Reply Mem. | -- | Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Response to Brief of Amicus Curiae Catholic Healthcare West in Support of Plaintiffs [Dkt24] |
| SPA | -- | State Plan Amendment |

# I.     STATEMENT OF JURISDICTION

Plaintiffs/Appellants invoked the jurisdiction of the district court under 42 U.S.C. §1395oo(f) and 28 U.S.C. §1331, seeking judicial review of the final decision of Defendant/Appellee, Secretary of Health and Human Services ("HHS"),  refusing to reimburse Plaintiffs, five non-profit acute care hospitals ("the Hospitals") located in California, for Medicare bad debts relating to services provided from May 1, 1994 through June 30, 1998.  The district court granted the Secretary's motion for summary judgment in a memorandum opinion and order entered on November 9, 2012.  The Hospitals timely filed a notice of appeal on December 12, 2012.  This Court has jurisdiction under 28 U.S.C. §1291.

# II.     ISSUES PRESENTED FOR REVIEW

When hospitals are unable to collect Medicare copayments, the Secretary's "bad debt" regulation requires the Medicare program to pay these amounts to prevent shifting the cost of serving Medicare patients to the hospitals' non-Medicare patients. Here, even though the Secretary does not dispute that the Hospitals have correctly calculated the amount of the unpaid Medicare copayments, the Secretary refuses to pay these Medicare bad debts because the Hospitals have not produced a determination from the State of California confirming the Hospitals' calculation – a determination the State refuses to provide.  At the time the claims at issue arose,

1

however, the Secretary did not require a State determination as a condition for payment of Medicare bad debts.  The questions presented are:

1.     Whether the Secretary can lawfully apply the "mandatory State determination" policy to deny payment for Medicare bad debt claims that arose before that policy was first enunciated, and shift Medicare costs to non-Medicare patients, where (a) at the time the claims at issue arose, and long before August 1, 1987, the Secretary explicitly permitted hospitals to document their Medicare bad debts without a State determination, (b) Congress explicitly prohibited the Secretary from changing Medicare bad debt policy that was in place as of August 1, 1987, (c) the "mandatory State determination" policy was not adopted using a notice and comment regulation, and (d) the Secretary applied the "mandatory State determination" policy retroactively.

2.     Whether the Secretary can lawfully apply the "mandatory State determination" policy to deny payment for the Medicare bad debt claims at issue where (a) the Secretary does not dispute that the Hospitals have correctly calculated the Medicare amounts owed and (b) the Secretary paid similar claims under virtually identical circumstances.

3.     Whether the district court improperly refused to consider the argument made by the Hospitals and the *amicus curiae* that the Secretary violated the statutory "Bad Debt Moratorium."

4.     Whether the district court improperly deferred to the Secretary.

### III.   STATUTES AND REGULATIONS INVOLVED

Relevant statutory and regulatory provisions are in the Addendum filed herewith.

### IV.   STATEMENT OF THE CASE

The Medicare Act prohibits the Secretary from adopting regulations that shift the cost of serving Medicare beneficiaries to non-Medicare patients, and *vice versa*. 42 U.S.C. §1395x(v)(1)(A)(i).  Thus, when a hospital is unable to collect Medicare deductible and/or coinsurance payments ("Medicare copayments"), the Secretary's "bad debt" regulation requires the Medicare program to pay these costs because:

> . . . The failure of beneficiaries to pay the deductible and coinsurance amounts could result in the related costs of covered services being borne by other than Medicare beneficiaries.  To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts that remain unpaid are added to the Medicare share of allowable costs.

42 C.F.R. §413.89(d).[2]  The Hospitals here seek payment for Medicare bad debts arising from inpatient services provided to patients eligible for both Medicare (typically because of age) and Medicaid (typically because of indigence).  These are known as the "dually-eligible."

Because Medicaid patients are presumptively indigent under the Secretary's bad debt rule, hospitals generally seek to collect Medicare copayments for services

---

[2]  This regulation, formerly codified at 42 C.F.R. §413.80, was redesignated as §413.89, effective August 11, 2004, but remained essentially unchanged.  We use the more recent designation herein to conform to the Secretary's Final Decision.

provided to dually-eligible patients from the appropriate Medicaid State agency. Before 1997, Medicaid typically paid the full amount of Medicare copayments and the Secretary reasonably refused to pay these costs, as hospitals could seek payment from Medicaid.

The Balanced Budget Act of 1997 gave State Medicaid programs *carte blanche* to refuse to pay <u>any portion</u> of Medicare copayments if (as with the claims at issue ) Medicaid pays less than Medicare.  So, if Medicaid's payment for a service is $100 and Medicare paid $110 for the service and an additional Medicare copayment of $20 is due, Medicaid would not pay any of the $20 Medicare copayment.   The Secretary has never disputed that, in this type of "ceiling" case,[3] Medicare must pay the Medicare copayment as a Medicare bad debt in order to avoid unlawful cost-shifting.

Similarly, in another type of ceiling case, where Medicaid paid a portion of the Medicare copayment because the amount that Medicaid would have paid on the claim (in the absence of Medicare) is more than what Medicare actually paid, but still less than the entire Medicare copayment due, Medicare would pay the remainder as a Medicare bad debt.  Where Medicaid does not pay the entire Medicare copayment, Medicare must make sure that it pays only that portion of the Medicare copayment that Medicaid did not pay.

---

[3] The Secretary has historically referred to a situation where Medicaid was financially responsible for less that the full amount of the Medicare copayment as a "ceiling" case.  The Hospitals use this phase when discussing the Secretary's bad debt policy.

Here, for more than 15 years, the California Medicaid State agency ("Medi-Cal") has refused to make determinations of Medi-Cal's liability for the Medicare copayments for the inpatient claims at issue. The Secretary, acting through her contractor ("the Intermediary"), stipulated below during administrative review that the Hospitals "supplied sufficient documentation to support their methodology for determining the bad debt amounts for each year under appeal." AR308 (JAXX).[4] For this, and other reasons, the amount at issue is not in dispute.

The Secretary, nevertheless, has refused to pay these Medicare copayments and the Hospitals appealed to the Provider Reimbursement Review Board ("the PRRB"), an independent tribunal established by Congress to adjudicate Medicare payment disputes. The PRRB found that the Hospitals were entitled to the full amount of the payment they sought because (a) "the Intermediary improperly disallowed the Providers' claim for Medicare bad debts," (b) the Hospitals had "complied with the Medicare billing requirements," and (c) that the Secretary could "easily" calculate the bad debt amount due. *SD 94/95/96-97 Inpatient Crossover Bad Debts Groups/Sharp HC 97 Inpatient Unproc. Crossover Bad Debts Group, San Diego County, California, v. BlueCross BlueShield Association/National Government Services, Inc*., PRRB Decision (March 18, 2010) (hereinafter "PRRB Dec.") at 8-9 (JAXX-XX):

---

[4] The administrative record is "AR." When a document is in the Joint Appendix, "JA" is noted.

Reversing the PRRB, the Secretary refused to pay the Hospitals' bad debt claims based *solely* on the supposed "undisputed fact that there are no determinations by the State on these claims," which the Secretary asserts caused the Hospitals to fail to meet their obligations under the alleged "must bill/mandatory State determination" policy (referred to hereinafter as the "mandatory State determination" policy).[5]

The "mandatory State determination" policy, however, cannot be applied here because the "Bad Debt Moratorium," first enacted by Congress in 1987, prohibits the Secretary from changing bad debt policies that were in effect as of August 1, 1987.[6]  It was not until an adjudication decision issued in 2000 that the Secretary first stated that the failure to bill the State and obtain a State determination in a ceiling case was a basis for denying payment for valid Medicare bad debts.  Before that time, and going back to 1970, the Secretary's policy was to pay Medicare copayment bad debts for the dually-eligible where, as here, the hospital shows that no other entity is responsible for such payment.

Further, in November 1995, the Secretary issued instructions in the Provider Reimbursement Manual, Part II ("PRM-II") §1102.3L explicitly confirming the

---

[5] *SD 94/95/96-97 Inpatient Crossover Bad Debts Groups/Sharp HC 97 Inpatient Unproc. Crossover Bad Debts Group, San Diego County, California, v. BlueCross BlueShield Association/National Government Services, Inc*., CMS Administrator Decision (May 17, 2010) (hereinafter "Sec. Dec.") at 20-21 (JAXX-XX).

[6] *See Foothill Hospital – Morris L. Johnston Memorial v. Leavitt,* 558 F. Supp. 2d 1 (D.D.C. 2008).

flexibility providers had to document bad debts <u>without</u> billing the State Medicaid program and obtaining a State determination ("However, it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt where the provider can establish that Medicaid is not responsible for payment."). These unambiguous instructions, confirming the Secretary's "alternate documentation" policy, were in place at all times relevant for most of the claims at issue in this action, which were for services provided from May 1, 1994 through June 30, 1998.

Also, apart from being invalid because it violates the Bad Debt Moratorium, the "mandatory State determination" policy cannot be reasonably applied here because that policy is predicated on the unexcepted expectation that States will issue the required determinations and, therefore, does not address what should happen where, as here, the State refuses to do so. It is unreasonable for the Secretary to use that policy to deny payment to the Hospitals here because Medi-Cal refused to make the determinations the Secretary expected it to make – a situation entirely out of the Hospitals' control (but not out of the control of the Secretary, who has plenary authority over the Medicaid program but has never required the States to issue the determinations which she insists are required, when doing so would have resolved this case).

Whereas it is reasonable under these circumstances to require the Hospitals to prove that they are entitled to the Medicare bad debt payment claimed, it is unreasonable for the Secretary to use Medi-Cal's refusal to issue a determination as a pretext for refusing to pay the valid Medicare bad debt amounts at issue, particularly when the inexorable effect is the unlawful shift of undisputed Medicare costs to the Hospitals' non-Medicare patients.

In sum, the Secretary's refusal to pay the Hospitals' Medicare bad debts claims based on the "mandatory State determination" policy is improper because (a) the Secretary issued that policy after the claims at issue arose, and applying that policy here violates the "Bad Debt Moratorium" because that policy conflicts with the "alternative documentation" policy that had been in place since 1970, (b) it was not in the form of a notice and comment regulation and, therefore, cannot be applied to the Hospitals under 42 U.S.C. §1395hh(a)(2) and other authorities, (c) even if a valid rule, it cannot have a retroactive effect under *Bowen v. Georgetown University Hospital ("Georgetown")*, 488 U.S. 204 (1988), and (d) it is otherwise arbitrary and capricious and lacking in substantial evidence under the Administrative Procedure Act ("APA"), 5 U.S.C. §§551 *et seq.*

Further, even if the "mandatory State determination" policy had been lawfully in place when the Hospitals' claims arose, it would be arbitrary and capricious for the Secretary to apply it because (a) the Secretary does not dispute the Medicare bad debt

amounts that the Hospitals claim and (b) the Hospitals documented their right to payment for the claims at issue using the same methodology that the Secretary accepted to pay Medicare bad debt claims for other dually-eligible Medi-Cal patients of the Hospitals for services provided during the same time period. Thus, this Court must reverse the Secretary's refusal to pay the slightly more than $2 million in Medicare bad debts in total that the five non-profit hospitals here are seeking.

### V.     STATEMENT OF FACTS AND PRIOR PROCEEDINGS

### A.     General Background of the Medicare and Medicaid Programs

The Medicare Act, Title XVIII of the Social Secretary Act, 42 U.S.C. §§1395 *et seq*., establishes a program of health insurance for the aged, disabled, and individuals with end-stage renal disease. This case involves Medicare Part A, which addresses payments for hospital inpatients. The Secretary, the federal official responsible for administering the Medicare program, has delegated that responsibility to the Centers for Medicare & Medicaid Services ("CMS"), an agency within HHS.[7] CMS has contracted out many Medicare administrative functions, including payment, to private organizations, including the Intermediary. *See, e.g*., 42 U.S.C. §1395h.

The Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§1396 *et seq*., establishes a federal-state program that finances medical care for the poor,

---

[7]    Before June 14, 2001, CMS was known as the Health Care Financing Administration ("HCFA"). In this brief, we refer to the agency as "CMS," even for events before June 14, 2001.

regardless of age.  To participate in Medicaid, a State must submit to the Secretary for approval a plan that sets forth, among other things, how much the State will reimburse providers for covered medical services.  42 U.S.C. §§1396a(a), 1396a(b), and 1396b.

Those eligible for both Medicare and Medicaid (the "dually-eligible") are generally the elderly poor.  Claims for hospital inpatient services provided to dually-eligible patients that are presented to Medicaid for payment of Medicare copayments are generally referred to as "crossover claims" because, after Medicare has processed the claims, the Federal government electronically "crosses over" these claims to Medicaid for payment of the Medicare cost sharing obligations.

## B.    <u>Notice and Comment Rulemaking Required Under Medicare</u>

Under 42 U.S.C. §1395hh(a)(1), the Secretary must "prescribe such regulations as may be necessary to carry out the administration" of the Medicare program.  That statute also states:

> No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this title shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

42 U.S.C. §1395hh(a)(2).  The Secretary has published many rules implementing the Medicare program in various manuals, such as the Provider Reimbursement Manual ("PRM").  Because these manual provisions are not promulgated in accordance with the notice and comment provisions of the APA, they are not effective to the extent

they do not meet 42 U.S.C. §1395hh(a)(2).  Moreover, the Secretary's regulations cannot have a retroactive effect under *Georgetown, supra*.

## C.     The Medicare Hospital Payment System

Until 1983, Medicare reimbursed hospitals based on the lower of their reasonable costs or customary charges for services provided to Medicare beneficiaries. *See* 42 U.S.C. §1395f(b)(1).  Effective with cost reporting years beginning October 1, 1983, Congress adopted a prospective payment system ("PPS") to reimburse hospitals for their inpatient operating costs.  *See* 42 U.S.C. §1395ww(d).  However, Medicare bad debt payments are made using essentially a cost-based methodology.

## D.     The Medicare Appeals Process

Payment to providers of services is commonly carried out by Medicare fiscal intermediaries (now called Medicare Administrative Contractors). The Hospitals use "the Intermediary" to refer to the various entities serving as their Medicare fiscal intermediary during the times relevant to this action.  At the close of their fiscal year ("FY"), hospitals submit a Medicare cost report showing the costs they incurred during the FY.  The Medicare intermediary audits the cost report and issues a Notice of Program Reimbursement ("NPR"), setting forth the final determination of the hospital's Medicare reimbursement for that FY.  A hospital that is dissatisfied with its Medicare payment for a FY may appeal to the Provider Reimbursement Review Board ("the PRRB").  42 U.S.C. §1395oo.

The decision of the PRRB constitutes final administrative action for purposes of judicial review unless the Secretary reverses, affirms, or modifies the PRRB's decision.   42 U.S.C. §1395oo(f)(1); 42 C.F.R. §§405.1875 and 405.1877.   The Secretary has delegated the authority to review PRRB decisions to the CMS Administrator.   A hospital may obtain judicial review of a final administrative decision by filing in Federal district court.  42 U.S.C. §1395oo(f).

**E.**   **Payment for Medicare Bad Debts**

    1.    **Medicare Must Pay Bad Debts to Prevent Illegal Cost Shifting**

The Medicare statute prohibits cost shifting.  42 U.S.C. §1395x(v)(1)(A).  If a hospital is unable to collect Medicare copayments, payment of these amounts are Medicare bad debt payments is necessary to prevent improperly shifting these Medicare costs to non-Medicare patients.  42 C.F.R. §412.89(d).

    2.    **Use of "Reasonable Collection Efforts"**

In order to qualify for Medicare bad debt payments, the "provider must be able to establish that reasonable collection efforts were made" and that the "debt was actually uncollectible when claimed as worthless."  42 C.F.R. §413.89(e)(2) and (3). PRM, Part I ("PRM-I") §310 states that a provider's effort to collect Medicare copayments must be similar to the provider's effort to collect comparable amounts

from non-Medicare patients.[8]  However, if a Medicare patient is indigent, copayments are deemed uncollectible without the need to meet the reasonable collection effort requirements in PRM-I §310.  This is because, under PRM-I §312, "providers can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid…."  Further, "[o]nce indigence is determined [. . .] the debt may be deemed uncollectible without applying the §310 [*i.e.* reasonable collection effort] procedures.  (See §322 for bad debts under State welfare programs)."  *Id.*

Under PRM-I §322, hospitals are permitted to claim as Medicare bad debts Medicare copayments related to the dually-eligible that are not payable by Medicaid:

> Where the State is obligated either by statute or under the terms of its plan to pay all, or any part of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare. Any portion of such deductible or coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare provided that the requirements of §312 or, if applicable, §310 are met.

Emphasis added.  PRM-I §322 concludes by explaining that:

> If neither the [Medicaid] plan nor State or local law requires the welfare agency to pay the deductible and coinsurance amounts, there is no requirement that the State be responsible for these amounts.  Therefore, any such amounts are includable in allowable bad debts provided that the requirements of §312, or if applicable, §310 are met.

---

[8]  PRM-I §§310, 312, and 322 and PRM-II §§1102.3L are reproduced at Exhibit 2 of the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment [Dkt16] ("Hosps.' Init. Mem.") at 12.

Although PRM-I §310 does not apply in light of PRM-I §312, hospitals, under PRM-I §312.C., "must determine that no source other than the patient would be legally responsible for the patient's medical bill; *e.g.*, [Medicaid], local welfare agency and guardian."

### 3.   **Medicare Bad Debt Moratorium**

Effective August 1, 1987, Congress enacted the "Bad Debt Moratorium" that unambiguously prohibits the Secretary from making "any change" to Medicare's bad debt policy as of that date.   At all times relevant to this case, the Bad Debt Moratorium stated as follows:

> In making payments to hospitals under [the Medicare program], the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under [the Medicare program] to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] (including the criteria for what constitutes a reasonable collection effort, including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency).  The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy.

Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100-203, sec. 4008(c), 101 Stat. 1330-55, as amended by the Technical Miscellaneous Revenue Act of 1988, Pub.L. No. 100-647, sec. 8402, 102 Stat. 3798, and as further amended by the

Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101-239, sec. 6023, 103 Stat. 2176 (codified as a note to 42 U.S.C. § 1395f (1992)). *See Foothill Hospital – Morris L. Johnston Memorial v. Leavitt,* 558 F. Supp. 2d 1, 6  (D.D.C. 2008) ("The plain meaning of this  sentence [*i.e.*, the final sentence] is that the Secretary is prohibited from making any changes in the agency's bad debt policy as it existed as of August 1, 1987.").

4.    **As of August 1, 1987, the Secretary Did Not Require a State Determination for Payment of Medicare Bad Debts Relating to Dually-Eligible Patients**

A patient's Medicaid eligibility status at the time of a hospital service is often unclear because that status can change monthly and retroactively.  Thus, Medicaid eligibility status is often not settled until long after the services have been provided. The "State maintains the most accurate patient information to make the determination of a patient's Medicaid eligibility status at the time of service and, thus, to determine its cost sharing liability for unpaid Medicare deductibles and coinsurance."  Sec. Dec. at 11 (JAXX).  Under PRM-I §312.C., the provider "must determine" whether a State Medicaid agency is responsible for the Medicare copayments of its dually-eligibles.

In November 1995, the Secretary issued instructions in PRM-II §1102.3L confirming that providers had the flexibility to prove this determination by supplying (a) the Medicaid claims processing form (the "Medicaid remittance advice"), which shows the Medicaid payment obligation, if any, for the claim (including Medicare

copayments), or (b) alternative documentation of the State's lack of responsibility for payment. PRM-II §1102.3L states:

> Evidence of bad debt arising from Medicare/Medicaid crossovers may include a copy of the Medicaid remittance showing the crossover claim and resulting Medicaid payment or nonpayment. <u>However, it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt where the provider can establish that Medicaid is not responsible for payment.</u> In lieu of billing the Medicaid program, the provider must furnish documentation of:
>
> •     Medicaid eligibility at the time services were rendered (via valid Medicaid eligibility number), and
>
> •     Nonpayment that would have occurred if the crossover claim had actually been filed with Medicaid.
>
> The payment calculation will be audited based on the state's Medicaid plan in effect on the date that services were furnished. Providers should be aware of any changes in the Medicaid payment formula that might impact the crossover calculation, and ensure that these changes are reflected in the claimed Medicare bad debt.

Emphasis added. Significantly for purposes of this action, and contrary to the subsequently implemented "mandatory State determination" policy, billing the State Medicaid program is not required. These instructions were in place at all times relevant for most of the Hospitals' claims, which were for services provided from May 1, 1994, through June 30, 1998.

     5.     **The Secretary First Articulated a Requirement for a State Determination in 2000**

In a decision issued in 2000, the CMS Administrator first alleged to have "interpreted" PRM-II §1102.3L to require providers to submit claims of dually-

eligible patients to Medicaid and to obtain a remittance advice showing Medicaid's payment determination as a condition of Medicare's bad debt payment.[9]  In deciding the *Outpatient Bad Debt Appeal-PRRB Dec.*, the PRRB rebuffed the Secretary's insistence on a State determination, finding that it imposes a requirement that is inconsistent with PRM-II §1102.3L.[10]  Specifically, the PRRB stated:  the "'per se must bill policy,' which requires Providers to bill the State <u>and receive a Medi-Cal remittance advice in order to claim outpatient crossover bad debt</u>, imposes a requirement beyond those found in the regulations and program instructions."  *Id*. (emphasis added).

     In reversing the PRRB, the Administrator did not contend that the applicable regulations or manual provisions explicitly set forth the "mandatory State determination" policy, conceding:  "[T]he policy requiring a provider to bill the State is consistent with the general statutory and regulatory provisions relating specifically to the payment of bad debts and generally to the payment of Medicare reimbursement."  *Outpatient Bad Debt Appeal-Adm. Dec*. at 9.  The Ninth Circuit

---

[9]  *See California Hospitals 90-91 Outpatient Crossover Bad Debts Group v. Blue Cross and Blue Shield Association/Blue Cross of California/Mutual of Omaha/Aetna Life Insurance Company ("Outpatient Bad Debt Appeal-Adm. Dec.")*, CMS Administrator Decision. (Oct. 31, 2000) (Exhibit 4 to Hosps.' Init. Mem.).

[10]  *See California Hospitals Outpatient Crossover Bad Debts Group Appeal v. Blue Cross of California/Mutual of Omaha/Aetna Life Insurance Company ("Outpatient Bad Debt Appeal-PRRB Dec.")*, PRRB Decision. 2000-D80 (Sept. 6, 2000) at 17 (Exhibit 5 to Hosps.' Init. Mem.).

ultimately upheld the *Outpatient Bad Debt Appeal-Adm. Dec.* in *Community Hospital of the Monterey Peninsula v. Thompson ("Monterey Peninsula")*, 323 F.3d 782 (9th Cir. 2003). The Ninth Circuit did so even though it agreed with the PRRB that "the text of §1102.3L is not subject to the interpretation that the Secretary seeks to give it." *Id*. at 798-99. However, the Court found that PRM-II §1102.3L did not apply in that case because it was not issued until 1995 and, therefore, "was not in existence during the relevant period" at issue in that case because the claims at issue in that case arose beforehand. *Id*. at 798-99. Importantly, the Court also held that, "to the extent PRM-II § 1102.3L is read to authorize reimbursement to the Providers in this case, it cannot be enforced" because "the Providers did not maintain contemporaneous documentation in the ordinary course of business to support their claim." *Id*. at 799.

*Monterey Peninsula* does not apply here because, unlike there, most of the claims at issue here arose <u>after</u> PRM-II §1102.3L was published. Also, this action involves <u>inpatient</u> claims, rather than the outpatient claims at issue in *Monterey Peninsula*. This is important because, unlike outpatient claims, the Federal government <u>automatically</u> crosses-over inpatient claims of the dually-eligible from Medicare and to Medicaid for payment of copayments, thereby meeting the claims submissions requirement of the "must bill" policy.[11] Moreover, unlike the hospitals in

---

[11] "In a letter dated November 3, 2008, the Providers stated that the claims manager of United Government Services, the relevant Intermediary, confirmed that the (footnote continued)

*Monterey Peninsula,* which did not maintain contemporaneous documentation of the bad debts at issue, which was crucial to the Court's decision, the Hospitals indisputably have such documentation.

6. **JSM-370**

After effectively repealing PRM-II §1102.3L in 2003, CMS issued a memorandum in 2004 entitled "Medicare 'Must Bill' Policy for Reimbursement of Dual-Eligible Bad Debts," commonly called Joint Signature Memorandum 370 ("JSM-370"). JSM-370 established the following "hold harmless" policy relating to PRM-II §1102.3L:

> This memorandum is to serve as a directive to hold harmless providers that can demonstrate that they followed the instructions previously laid out at 1102.3L, for open cost reporting periods beginning prior to January 1, 2004. Intermediaries who followed the now-obsolete Section 1102.3L instructions for cost reporting periods prior to January 1, 2004 may reimburse providers they service for dual-eligible bad debts with respect to unsettled cost reports that were deemed allowable using other documentation in lieu of billing the state. . . .

JSM-370 at 1-2 (AR 383-384 (JAXX)).

---

Intermediary did have a system to automatically transfer Medicare claims data to the Medicaid Program. This was corroborated in the September 17, 2008 letter from the Intermediary's representative at the hearing. Thus, the Board concludes that the Providers complied with the Medicare billing requirements." PRRB Dec. at 9 (JAXX) (footnotes omitted).

F.     __Medi-Cal's Payment of Medicare Copayments for Dually-Eligibles__

Prior to May 1, 1994, Medi-Cal paid all Medicare copayments for dually-eligible Medi-Cal enrollees.  Accordingly, before that date, hospitals never had any Medicare bad-debt claims relating to Medi-Cal dually-eligible patients. Hosps.' Init. Mem. at 12.

Effective May 1, 1994, but without obtaining the Secretary's required permission, Medi-Cal implemented a new policy under which Medi-Cal would pay Medicare copayments only if the Medicaid payment rate for the claim at issue exceeded the Medicare payment for the claim.  Under this new policy, for example, if the Medicare payment (without copayments) was $2,000 and the unpaid Medicare copayment was $300, and the Medi-Cal payment rate was $1,900, Medi-Cal would not pay any portion of the $300 Medicare copayment (it, therefore, would become Medicare bad debt).  However, if the Medi-Cal payment rate was $2,100, Medi-Cal would pay $100 of the $300 Medicare copayment and the other $200 would become Medicare bad debt, payable by Medicare.  *Id*. at 12-13.

Medi-Cal also stopped paying anything for Medicare copayments relating to inpatient services provided to its dually-eligible enrollees.  CMS Bulletin No. 96-37 at 1 (AR255 (JAXX)).  "Thus, hospitals who submitted a crossover claim to the State for the affected services received a State Remittance Advice showing 100% non-payment, regardless of the category of Medicaid recipient."  *Id*.

Because Medi-Cal implemented this policy without obtaining the necessary prior permission of the Secretary, CMS refused to accept these payment changes and instructed its intermediaries not to recognize the unpaid Medicare copayments as Medicare bad debts.  CMS Bulletin No. 95-3 (AR258 (JAXX)).[12]  Faced with substantial payment reductions, California hospitals (including the Hospitals) filed a class action to compel Medi-Cal to pay Medicare copayments in accordance with the Medi-Cal/California State Plan.  The Hospitals prevailed and the United States District Court for the Central District of California enjoined Medi-Cal from paying less than the full amount of the Medicare copayments prospectively for all claims pending as of December 11, 1995.  *Beverly Cmty Hosp. v. Belshe*, No. 95-4053, 1995 WL 80520 (C.D. Cal. Dec. 19, 1995).  Meanwhile, California formally sought the Secretary's approval to eliminate Medi-Cal's responsibility to pay Medicare copayments for certain categories of Medi-Cal enrollees, which CMS approved in 1996, retroactive to May 1, 1994.  CMS Bulletin No. 96-37 at 1 (AR255 (JAXX)).

California hospitals (including the Hospitals) continued their efforts to obtain proper payment from Medi-Cal for Medicare copayments by filing another class action seeking to compel Medi-Cal to pay Medicare copayments for claims for services prior to December 11, 1995.  CMS 3/3/99 Letter to Blue Cross at 2 (AR274

---

[12]  At this time, not only was there no "mandatory State determination" policy, but CMS refused to accept such determinations here.

(JAXX)).  The hospitals and California settled this lawsuit on June 6, 1997.  *Id.*  After this settlement, CMS expected Medi-Cal to provide Medicare with documentation that would enable Medicare to determine all unpaid Medicare copayments that would be allowed as Medicare bad debt for claims arising from May 1, 1994, through December 10, 1995.  *Id.* at 2 (AR274 (JAXX)).

In 1997, however, Medicare became aware that Medi-Cal had been automatically issuing "zero-pay" Medicare copayment determinations in remittance advices without determining whether the Medicare payment actually exceeded the Medi-Cal rate.  CMS 3/3/99 Letter to Blue Cross at 2 (AR 274 (JAXX)).  Thus, CMS was instructed by the HHS Office of General Counsel not to make any Medicare bad debt payments for claims relating to dually-eligible Medi-Cal enrollees, even where Medi-Cal provided documentation concerning the Medicare copayments, because "Medicare will allow bad debts only after the State properly determines its share of payment."

## G.    <u>Relevant Congressional Action</u>

In 1997, Congress enacted §4714 of the Balanced Budget Act of 1997 ("BBA"), which "clarified" a State's right (with the Secretary's approval) to limit its payment for Medicare copayments to the Medicaid rate.  BBA §4714 correspondingly also clarified the extent of the Secretary's responsibility to pay Medicare bad debts relating to claims involving dually-eligible patients.  Pub. L. No. 105-33 §4714, amending 42

U.S.C. §1396a(n).   Based on this legislation, which the Ninth Circuit applied retroactively, the Ninth Circuit reversed the lower court and authorized Medi-Cal to recoup any Medicare copayments it had paid under the lower court's ruling that were in excess of its legal obligations. *Beverly Cmty Hosp. Association v. Belshe*, 132 F.3d 1259 (9th Cir. 1997).

**H.     The Secretary and Medi-Cal Agreed on a Process to Address Medicare Bad Debts Arising from May 1, 1994 through April 4, 1999**

The uncertainty about Medi-Cal's payment of Medicare copayments for their dually-eligibles was resolved in 1998 when Medi-Cal agreed to reprocess claims back to May 1, 1994.  After reprocessing these claims, Medi-Cal agreed, by July 1, 1999, to provide Medicare with reports for each provider "showing a comprehensive reprocessing of all crossover claims from May 1, 1994 to March of 1999" and documenting Medi-Cal's "cost sharing obligation and the remaining unpaid coinsurance and deductible amounts, with the understanding that the Intermediary "will use these reports as the basis for crossover bad debt reimbursement."  CMS 3/3/99 Letter to Blue Cross at 3 (AR 275 (JAXX)).  *Id.* at 3 (AR275 (JAXX)).  CMS thus agreed to make lump-sum payments to hospitals to reimburse them for Medicare bad debts associated with the unpaid Medicare copayments Medi-Cal enrollee claims. *Id.* at 3 (AR275 (JAXX)); Sec. Dec. at 5-6 (JAXX-XX).  California hospitals were not a party to this agreement.  Hosps.' Init. Mem. at 15-16.

Based on that agreement, CMS's March 3, 1999 letter instructed its intermediaries to make the first "lump sum" payment to hospitals for the Medicare bad debt due for the period of May 1, 1994, to November 30, 1996, relating to Medi-Cal dually-eligible inpatients.  AR275 (JAXX).  CMS's July 20, 1999 letter instructed its intermediaries (a) "to make the second retroactive lump sum payments" for the Medicare bad debts covering the period of May 1, 1994, to April 4, 1999, and (b) to provide hardcopy documentation to hospitals "that should contain all data elements furnished . . . by the State."  AR282 (JAXX).

## I.     The Lump-Sum Payment Claims Correction Process

In April 1999, the Intermediary issued the first "lump-sum" payment covering the period from May 1, 1994, to November 30, 1996, unaccompanied by any information regarding how the payment was determined.  Hosps.' Init. Mem. at 16.  In August 1999, the Intermediary issued the second and final lump-sum payment.  *Id*. The August 24, 1999 letter from the Intermediary directed the Hospitals to follow-up with the Intermediary and Medi-Cal if they were dissatisfied with the lump-sum payment, stating:

> If you feel we have not included all Medi-Cal provider numbers for your hospital or if you have a problem with the computation of the bad debt amount, please contact Ken Vanderbok at (805) 384-7110.  However, any disagreement related to claims data contained in and/or missing from the reports has to be addressed with the State.  The contact at the State is Michael Jimenez at (916) 464-0907.

AR331 (JAXX).

**J.    The Hospitals Determined that the Lump-Sum Payments Were Incomplete and Would Not be Corrected Through the Lump-Sum Process.**

When issuing the second lump-sum payment, the Intermediary also gave the Hospitals detailed information concerning how the two lump-sum payments were calculated, including complete lists of the claims addressed in each.  Hosps.' Init. Mem. at 17. The lists had patient identifying information, the Medicare payment amount, the Medi-Cal payment rate, and the difference between the Medicare and Medi-Cal payment amount, but did not identify the source of the information.  *Id.*  The lists were not actual remittance advices or claim forms and no such advices or forms were provided by Medi-Cal to the Intermediary.  *Id.*

Typically, a State's determination of its financial obligation is set forth in the remittance advice issued to the hospital for each Medi-Cal claim.  Here, instead of issuing remittance advices:

> The State Medi-Cal program furnished reports to the Intermediary that showed <u>the claim comparison of the amount paid by Medicare and the Medicaid payment rate</u> for inpatient dual eligible claims for the time period of May 1, 1994 through April 4, 1999.  Based on these reports the Intermediary issued lump sum payments to hospitals for the Medicare coinsurance and deductible amounts retroactively to May 1, 1994 that were unpaid by the State.  Having received a State determination on the claims listed, the related unpaid coinsurance and deductible amounts were considered allowable Medicare bad debts by CMS.  The final reports produced by Medi-Cal regarding inpatient claims in the Medicaid claims system and the lump sum payments were furnished to the Providers in August, 1999.

Sec. Dec. at 17 (JAXX) (emphasis added).

The "claim comparison of the amount paid by Medicare and the Medicaid payment rate" that was used to calculate the lump-sum payment was based on:

1. The patient being eligible for Medi-Cal when the services were provided,
2. The Medi-Cal payment rate on the claim, and
3. The amount that Medicare actually paid on the claim.

Medi-Cal took each Medicare payment amount and compared it to the amount Medi-Cal would have paid. *Id*. at 18. This calculation was formulaic because Medi-Cal pays hospitals using a "per-diem" rate. *Id*. So, for example, the Medi-Cal payment would be $3,000 for a 3-day inpatient stay where the per-diem rate was $1,000. The number of inpatient days for dually-eligible patients also comes from the Medicare Provider Statistical Reimbursement File ("the PS&R File"), which is prepared by the Secretary. *Id*. at 18-19. If the amount Medi-Cal would have paid was more than the amount Medicare paid on the claim, Medi-Cal would pay all or part of the Medicare copayments, up to its payment limit and Medicare would be responsible for the rest. If the amount Medi-Cal would have paid was less than the amount Medicare paid, the entire Medicare copayment would be a Medicare bad debt. PRRB Dec. at 6 (JAXX).

Medi-Cal did not determine the Medicare payment amount for the lump-sum claims – the Secretary reported that information to Medi-Cal (this information is also contained in the PS&R File). Hosps.' Init. Mem. at 19. Medi-Cal did, however, determine the patient's Medi-Cal eligibility for the lump-sum claims. The Medi-Cal payment rate, by contrast, is fixed, as set forth in contracts that Medi-Cal enters into

with hospitals annually. *Id*. Accordingly, to determine its payment obligation, Medi-Cal simply applied the rate in effect for the year in which the patient was discharged from the hospital for the inpatient stay that was the subject of the claim. *Id*. This was the process that the Secretary used to made the lump-sum settlement payments for the claims set forth in reports that Medi-Cal provided to the Hospitals. Sec. Dec. at 17 (JAXX).

"Upon review of the reports, the [Hospitals] believed the reports did not include all inpatient claims during the period covered by the lump sum payments." Hosps.' Init. Mem. at 19. The Hospitals, therefore, created a list of the missing claims, with all necessary documentation showing the Medicare bad debt payment due, which the Hospitals sent to Medi-Cal and the Intermediary. *Id*. The Hospitals also sent a letter to Medi-Cal formally requesting correction of the lump-sum payment data. PRRB Dec. at 5 (JAXX); AR354-55 (JAXX-XX). Medi-Cal, however, refused to address the missing claims, although it admitted the Hospitals had an accurate process for identifying the missing claims, stating that it "was instructed not to rerun any forms" because "we have a settlement here." AR115-116 (JAXX-XX). Medi-Cal told the Hospitals to contact Medicare. Medi-Cal also stated it "had no resources" to address the claims at issue, that "it [was not] going to rerun anything" and that it had been "instructed not to rerun any" claims. AR115 (JAXX).

Having reached a dead-end with Medi-Cal, the Hospitals reached out to the Intermediary, but fared no better. Specifically the Hospitals sent a letter to, and met with, the Intermediary concerning the missing claims. AR116 (JAXX). The Hospitals provided the Intermediary with all of their documentation to support their claims including a copy of the Medi-Cal eligibility lists from the State, the Medicare PS&R system reports, the letters and lists that accompanied the August 1999 lump-sum payment letters, and the lists the Hospitals created identifying the missing claims and related Medicare bad debts. AR122-123 (JAXX-XX).

Even though the Intermediary acknowledged that the Hospitals had "identified a lot of claims," it stated it "can't do anything" because there was an "agreement with the government programs" and it was "told not to allow any more claims." AR116 (JAXX). Indeed, the witness for the Intermediary testified at the PRRB hearing that the Intermediary "was precluded from making settlement or making payments for bad debts for this period outside the lump-sum settlement." AR147 (JAXX). The correction process, therefore, turned out to be illusory. In fact, Medi-Cal did not provide any revised data to the Intermediary. Hosps.' Init. Mem. at 20-21. Moreover, the Secretary had not given the Intermediary any instructions about what to do if Medi-Cal did address excluded claims. *Id.* Indeed, the Intermediary's witness testified that the Intermediary was "precluded from making a settlement outside the instructions from CMS that's in the agreement and the claims that were reprocessed

by the state of California." AR143 (JAXX).

After the August 1999 letter there was no further guidance issued by CMS to the Intermediary regarding the lump-sum payments. Hosps.' Init. Mem. at 21. Thus, the Hospitals' only recourse was to appeal to the PRRB, seeking review of the cost reports that included the lump-sum payment, which they did.

## K.     The Hospitals' Accurate Identification of the Amounts Due for the Medicare Bad Debts at Issue.

To determine the Medicare bad debt amounts due for the missing claims, the Hospitals needed to show for each claim (a) that the patient was eligible for both Medicare and Medi-Cal when the services were provided, (b) the Medicare copayment for the claim, and (c) Medi-Cal's obligation, if any, to pay the Medicare copayment. The record of this case is that the Hospitals have accurately identified the amounts due. PRRB Dec. at 6 (JAXX). Indeed, on page 7 of the Intermediary Position Paper - Supplemental dated January 10, 2008, and filed with the PRRB, the Intermediary stated that it is a "fact that the [Hospitals' have] identified additional deductible and coinsurance amounts associated with billed but unprocessed portions of these crossover charges that have not been reimbursed as bad debts." AR175 (JAXX). Here is how the Hospitals determined the amounts due.

### 1.     Eligibility for Medi-Cal

The Medi-Cal eligibility information for the patients at issue came from Medi-Cal itself. PRRB Dec. at 6 (JAXX); Sec. Dec. 17 (JAXX). To determine their

Medicaid-eligible inpatients, the Hospitals gave Medi-Cal a computer disk in Excel format containing all relevant information. If a inpatient's stay overlapped more than one month, the Hospitals made note of that on the disk. For example, if a patient was admitted June 16, 1995, and discharged on July 14, 1995, the patient stay was broken out into two time periods: June 16-30, 1995, and July 1-14, 1995. This was done because Medi-Cal eligibility status can change, but not more often than monthly.

Medi-Cal returned the same disk after adding an Excel column indicating Medi-Cal eligibility status. AR132-133 (JAXX-XX). For all of the claims at issue, the patient's Medi-Cal eligibility was "without restrictions." AR121 (JAXX). Accordingly, the record of this case is that Medi-Cal performed a claim-by-claim determination of the Medi-Cal eligibility for each inpatient stay at each of the Hospitals for each claim at issue. All of the Medi-Cal eligibility information from the disk was audited by the Intermediary. AR119 (JAXX).

### 2.   Determination that Medi-Cal Enrollees Were Also Eligible for Medicare

For the claims for which the Hospitals are seeking payment, the Hospitals identified their Medi-Cal-eligible inpatients who were also eligible for Medicare when the inpatient services were provided by using the Medicare PS&R file, which the Intermediary furnished to the Hospitals. PRRB Dec. at 6 (JAXX). The Hospitals matched the Medi-Cal eligibility information with the Medicare PS&R to determine which of their inpatients were dually-eligible when they received services at the

Hospitals. *Id.*

### 3.    **Determination of Medicare Bad Debt Payment Amount Due**

The Hospitals also used the Medicare PS&R report to identify for the claims at issue (a) Medicare's payment and (b) the Medicare copayment due.  PRRB Dec. at 6 (JAXX).  The Hospitals calculated the maximum liability for Medi-Cal related to each claim at issue by multiplying the length of stay (also from the Medicare PS&R) by the Medi-Cal per diem rate in effect at that time from each Hospital's Medi-Cal contract.  Hosps.' Init. Mem. at 23. The Hospitals' lists set forth every patient and the amount of the copayment that is allowable as Medicare bad debt that should have been, but were not, included in the lump-sum payments.  PRRB Dec. at 6 (JAXX).

The record shows that the determination by the Hospitals of Medi-Cal's payment obligation for the claims here was made using the same methodology that the Secretary used to determine Medi-Cal's payment obligation for the lump-sum claims.  PRRB Dec. 6 (JAXX).  This is why the Intermediary stipulated before the PRRB that the Hospitals "supplied sufficient documentation to support their methodology for determining the bad debt amounts for each year under appeal."  AR308 (JAXX).  The Intermediary agreed to the stipulation because, in determining the Medicare bad debt payment due for the claims at issue, the Hospitals "followed the same process that appeared to have been followed" by the Secretary's contractor when making the lump sum settlement payment.  AR119 (JAXXX).

**L.     During the Entire Period at Issue, Medicare Automatically Crossed-Over Dually-Eligible Claims to Medi-Cal.**

Because Medi-Cal paid all Medicare copayments for services provided before May 1, 1994, the Hospitals never had to submit anything to Medicare to support their bad debts because there was no Medicare bad debt.  Moreover, Medi-Cal made these payments without the Hospitals having to submit any claim to Medi-Cal because Medi-Cal had a crossover arrangement with Medicare whereby Medi-Cal automatically received from the Intermediary all information necessary to process the claims.  Sec. Dec at 19 (JAXX); PRRB Dec. at 7 (JAXX) and 9 (JAXX).  The Hospitals submitted their claims for the dually-eligible inpatients to Medicare; Medicare automatically sent the information to Medi-Cal, which in turn would process the information and pay the Hospitals.  *Id*.  There is no hospital involvement beyond submitting claims to Medicare.  Sec. Dec. at 19 (JAXX).  Thus, the PRRB found that, for all of the claims at issue, "the inpatient crossover claims data was directly transferred to [Medi-Cal] by the Intermediary."  PRRB Dec. at 9 (JAXX).

**M.     Prior Proceedings**

1.     **The PRRB's Decision In Favor of the Hospitals**

The PRRB found that "[t]he Intermediary improperly denied the Providers the right to claim additional Medicare bad debts" and, therefore, reversed the Intermediary's adjustments.  PRRB Decision at 9 (JAXX).  The PRRB also found that the bad debts at issue were billed by the Hospitals and that the claims data was directly transferred to Medi-Cal by the Intermediary and, thus, concluded that the Hospitals complied with all Medicare billing requirements.  *Id.* at 9 (JAXX).  The PRRB further found that the Intermediary incorrectly applied PRM-I §322 to deny payment on the crossover bad debts and "could easily determine the amounts which [Medi-Cal] is not obligated to pay."  *Id.* at 9 (JAXX).

2.     **CMS Administrator Reverses the PRRB**

The CMS Administrator reversed the PRRB's decision, stating , in relevant part, stated: "This case turns on the undisputed fact there are no determinations by the State on these claims."  Sec. Dec. at 20 (JAXX).  While there appeared to be a factual dispute about whether all of the claims at issue had, in fact, been crossed-over from Medicare to Medi-Cal, the Administrator's Decision makes clear that any such dispute was not a basis for her decision:

> Moreover, while not determinative of this case, the Providers were aware that some claims were not crossing over and were not showing up on the Medicaid remittance advices and required direct billing of the State.  The Providers decided not to take such action to direct bill in all such cases.

*Id.* at 20-21 (JAXX).  The Administrator's Decision constitutes the Secretary's final decision for purposes of judicial review.

### 3.    District Court Decision

The Hospitals timely sought judicial review of the Administrator's decision and the district court entered a memorandum opinion and order granting the Secretary's Motion for Summary Judgment and denying the Hospitals' Cross-Motion for Summary Judgment.  In doing so, the court recognized that "the Secretary does not dispute the [Hospitals'] position" that they used Medicaid eligibility information "directly from the State" for purposes of determining the bad debt claims at issue and " the reliability of [that] information."  *Grossmont Hospital Corp., et al. v. Sebelius*, 903 F. Supp. 2d 39, 53 (D.D.C. 2012).

The court nevertheless ruled against the Hospitals because their bad debt "reports were prepared by the [Hospitals] themselves, and not by the State of California."  *Id.* (emphasis in original).  It went on:

> On balance, while the Court does not necessarily disagree with the [Hospitals] that, in some circumstances, their alternative methodology could be equally as effective and accurate as the process embraced by the Secretary, the Court is unable to conclude that the Secretary's interpretation is "plainly erroneous or inconsistent with [her] regulation[s]."

*Id.* at 54 (citation omitted).  Finally, as discussed in more detail in Section VIII.D., below, the court erroneously refused to consider the Hospitals' primary argument (and

supporting arguments made by the district court amicus) that the "mandatory State determination" policy is invalid because it violates the Bad Debt Moratorium. *Id*. at 48-49.

## VI.    STANDARD OF REVIEW

This Court exercises *de novo* review of the legal issues in this appeal, including the district court's grant of summary judgment. *Pub. Citizen, Inc. v. HHS.*, 332 F.3d 654, 658 (D.C. Cir. 2003). Jurisdiction over this action arises under 42 U.S.C. §1395oo(f), which provides that it "shall be tried pursuant to the applicable provisions under" the APA. Accordingly, this Court's review is governed by 5 U.S.C. §706, which requires the Court to determine whether, *inter alia*, the Secretary's decision is arbitrary and capricious, an abuse of discretion, not based on substantial evidence, or otherwise not in accordance with law. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414-17 (1971). If so, the Court must set it aside.

In *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.("Motor Vehicle")*, 463 U.S. 29 (1983), the Supreme Court described the "arbitrary and capricious" standard as follows:

> Normally, an agency rule would be arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id*. at 63.  Similarly, the "substantial evidence" standard requires an in-depth review of the facts relied upon by the agency in its decision:

> Review under the substantial evidence standard is not to be superficial or cursory.  Rather, the court's inquiry must be searching and careful, subjecting the agency's decision to close judicial scrutiny . . . the reviewing court must take into account whatever in the record clearly detracts from the weight of the evidence.

*Memorial, Inc. v. Harris*, 655 F.2d 905, 912 (9th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 705 (D.C. Cir. 1986) ("Our review in substantial-evidence cases calls for careful scrutiny of the entire record.").  Finally, a reviewing court may uphold agency action only on the basis articulated by the agency in its decision, not on *post-hoc* rationalization offered by the agency or its counsel.[13]

Although deference to the Secretary's actions may be appropriate under certain circumstances, such deference is inappropriate here because informal agency interpretations, such as the Secretary's in this case, that do not create binding legal norms (*e.g.*, notice-and-comment rulemakings; formal adjudications) are not entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984).  *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Further, it is well established "that an agency must cogently explain why it has exercised its discretion in a given manner and that explanation must be sufficient to

---

[13] *See Industrial Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 631 n.31 (1980); *Biloxi Regional Medical Center v. Bowen*, 835 F.2d 345, 348 n.12 (D.C. Cir. 1987).

enable us to conclude that the [agency's action] was the product of reasoned decisionmaking." *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 460; (D.C. Cir. 2000). Finally, an agency's interpretation is not entitled to deference where the agency has erratically and inconsistently construed its charter. *National Treasury Employees Union v. FLRA*, 399 F.3d 334, 337 (D.C. Cir. 2005).

## VII.  SUMMARY OF THE ARGUMENT

The Hospitals seek Medicare bad debt payments for Medicare copayments related to services provided to inpatients who were "dually-eligible" under both Medicare and Medi-Cal.  Medi-Cal was legally responsible for paying only a small part of these Medicare copayments and Medicare was responsible for paying the rest. The Hospitals seek from the Secretary only the Medicare bad debt amounts that Medicare is indisputably solely obligated to pay.

Payment of Medicare bad debts is required by a regulation that the Secretary adopted to implement the statute prohibiting shifting the cost of Medicare patients to non-Medicare patients.  During the administrative proceedings, using the Secretary's own methodology and relying exclusively on information from Medicare and Medi-Cal, the Hospitals documented the precise amount that Medicare owes for the Medicare bad debts at issue.  The Secretary's contractor stipulated that the Hospitals "supplied sufficient documentation to support their methodology for determining the bad debt amounts for each year under appeal."  AR308 (JAXX).  Hence, the PRRB

found that the Secretary "could easily determine the amounts which [Medi-Cal] is not obligated to pay" and, thus, the Medicare portion of the Medicare bad debts due. PRRB Dec. at 9 (JAXX).

Despite clear statutory and regulatory mandates prohibiting cost-shifting, the Secretary has refused to pay the Medicare bad debts due. Her refusal, however, is not based on any objection to the Hospitals' calculation of the amount due, as she does not question that the Hospitals are only seeking the amounts due from Medicare. Rather, the *sole basis* for the Secretary's refusal to pay the Medicare bad debt amounts at issue is that the Hospitals allegedly did not "receive a determination from [Medi-Cal] on the amount of the [Medi-Cal] obligation on the claims at issue" and, therefore, the Secretary allegedly could not properly determine the Medicare bad debt payment due. Sec. Dec. at 20 (JAXX). Thus, the Secretary found that the cost-shifting prohibition must yield to her allegedly applicable "mandatory State determination" requirement and the payment denials here are fully justified because of the absence of a Medi-Cal determination.

The Secretary's denial of payment based on the "mandatory State determination" policy is improper because (a) the Secretary issued that policy after the claims at issue arose, and applying that policy here violates the "Bad Debt Moratorium" because that policy conflicts with the "alternative documentation" policy that had been in place since 1970, (b) it was not in the form of a notice and comment

regulation and, therefore, cannot be applied to the Hospitals under 42 U.S.C. §1395hh(a)(2) and other authorities, (c) even if a valid rule, it cannot have a retroactive effect under *Bowen v. Georgetown University Hospital ("Georgetown")*, 488 U.S. 204 (1988), and (d) it is otherwise arbitrary and capricious and lacking in substantial evidence under the APA.

Further, even if the "mandatory State determination" policy had been lawfully in place when the Hospitals' claims arose, it would be arbitrary and capricious for the Secretary to apply it because (a) the Secretary does not dispute the Medicare bad debt amounts that the Hospitals claim and (b) the Hospitals documented their right to payment for the claims at issue using the same methodology that the Secretary accepted to pay Medicare bad debt claims for other dually-eligible Medi-Cal patients of the Hospitals for services provided during the same time period.  Thus, this Court must reverse the Secretary's refusal to pay the just over $2 million in Medicare bad debts at issue in this action.

## VIII.  <u>ARGUMENT</u>

**A.    <u>The "Mandatory State Determination" Policy is Inconsistent With the Secretary's Rules, Violates the Statutory Bad Debt Moratorium, and is Otherwise Unlawful.</u>**

The Secretary does not dispute that the Hospitals have correctly calculated the amount they have been owed since 1999.  In addition, despite discussing the "must bill" policy at length in her final decision, the Secretary ultimately acknowledges that

this policy is "not determinative of this case."  Sec. Dec. at 21[14]  Rather, the Secretary's refusal to pay is based *entirely* on the "mandatory State determination" policy.  That policy, which the Secretary issued no earlier than 2000, cannot be applied here because it (a) violates the statutory Bad Debt Moratorium, (b) was not adopted in a notice and comment regulation as required by 42 U.S.C. §1395hh(a)(2) and other authorities, (c) cannot have a retroactive effect under *Georgetown, supra*, and (d) is otherwise unlawful.

The Secretary first enunciated the "mandatory State determination" requirement in a CMS Administrator's decision issued in 2000, after the claims at issue arose. Previously, the Secretary imposed no limit on the documentation that hospitals could use to prove Medicare's liability for payment of bad debts in "Medicaid ceiling" cases (*i.e.*, where Medicaid was financially responsible for less than the full amount of the Medicare copayment liability) and explicitly did not require hospitals to bill State Medicaid programs.

The Secretary addressed Medicaid ceiling claims in PRM §322, which was first issued in July 1970,[15] and which stated, in relevant part (emphasis added):

---

[14]  The Secretary, nevertheless, argued below that it was a separate and independent ground to uphold her decision, which the district court tersely rejected, stating that "an administrative decision may be upheld only on the grounds on which it was based. *Id* at 56.

[15] *See* Transmittal No. 22 to PRM-I (Exhibit 6 to Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment and in (footnote continued)

> Prior to 1968, title XIX State plans under the Federal medical assistance programs were required to pay the Part A deductible and coinsurance amounts for inpatient hospital services furnished through December 31, 1967.  <u>Any such deductible or coinsurance amounts not paid by the State were not allowable as a bad debt.</u>
>
> <u>Effective with the 1967 Amendments, States no longer have the obligation to pay deductible and coinsurance amounts for services that are beyond the scope of the State title XIX plan</u> for either categorically or medically needy persons. . . .
>
> Where the State is obligated either by statute or under the terms of its plan to pay all, <u>or any part</u>, of the Medicare deductible or coinsurance amounts, <u>those amounts are not allowable as bad debts under Medicare. Any portion of such deductible or coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare, provided that the requirements of §312 or, if applicable, §310 are met.</u>[16]

PRM §322 did not in 1970, and does not today, limit the documentation that hospitals can use to show the effect of a State's Medicaid ceiling on the payment due from Medicare for Medicare bad debts.  This is consistent with the general rule that hospitals may submit any relevant documentation to support a claim for Medicare payment.[17]  It is also consistent with PRM-I §312.C., under which the provider, not

---

Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment [Dkt20] ("Hosps.' Reply Mem.").

[16] Under PRM §312, "Once indigence is determined and the provider concludes that there had been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the §310 procedures. (See §322 for bad debts under State Welfare Programs.)."  Accordingly, where, as here, the patient is dually-eligible, PRM §322 applies to the exclusion of both §§310 and 312.

[17] *See, e.g.*, 42 C.F.R. §405.1851 (emphasis added) (". . . The Board shall inquire fully into all of the matters at issue and <u>shall receive into evidence</u> the testimony of (footnote continued)

the State, "must determine that no source other than the patient would be legally responsible for the patient's medical bill; e.g., [Medicaid], local welfare agency and guardian."

In November 1995, the Secretary issued PRM-II §1102.3L, which confirmed that there was no limit on the flexibility afforded hospitals to prove their dually-eligible Medicare bad debts. PRM-II §1102.3L stated that hospitals can document a State's Medicaid obligation for payment of Medicare bad debts by supplying (a) the Medicaid remittance advice or (b) alternative documentation of the State's lack of responsibility for payment. This manual provision explicitly stated that hospitals did not have to bill a State Medicaid program that had little or no liability for paying Medicare copayments:

> Evidence of bad debt arising from Medicare/Medicaid crossovers may include a copy of the Medicaid remittance showing the crossover claim and resulting Medicaid payment or nonpayment. However, it may not be necessary for a provider to actually bill the Medicaid program to establish a Medicare crossover bad debt where the provider can establish that Medicaid is not responsible for payment. In lieu of billing the Medicaid program, the provider must furnish documentation of:
>
> •      Medicaid eligibility at the time services were rendered (via valid Medicaid eligibility number), and

---

witnesses and any documents which are relevant and material to such matters. If the Board believes that there is relevant and material evidence available which has not been presented at the hearing, it may at any time prior to the mailing of notice of the decision, reconvene the hearing for the receipt of such evidence. . . . ).

- •    Nonpayment that would have occurred if the crossover claim had actually been filed with Medicaid.

The payment calculation will be audited based on the state's Medicaid plan in effect on the date that services were furnished. Providers should be aware of any changes in the Medicaid payment formula that might impact the crossover calculation, and ensure that these changes are reflected in the claimed Medicare bad debt.

PRM-II §1102.3L (emphasis added).  Thus, the Secretary confirmed her long-standing "alternative documentation policy."  Although the Secretary deleted §1102.3L from the PRM in 2003, that provision was in place at all times relevant for most of the Hospitals' claims, which were for services provided from May 1, 1994, through June 30, 1998.

In a decision issued in 2000, the Secretary sought <u>for the first time</u> to limit the "alternative documentation policy" by requiring a State determination as a condition of payment of Medicare bad debts for dually eligible patients.  *See Outpatient Bad Debt Appeal-Adm. Dec., supra.*  This decision involved hospital outpatient claims which, unlike inpatient claims, do not automatically "crossover" from Medicare to Medicaid (the hospitals in that case did not submit their outpatient claims to Medi-Cal).  The providers in that case relied on PRM-II §1102.3L for authority to use sampling, even though the Secretary's contractors had explicitly told the hospitals that they were required to bill each of the outpatient claims to Medi-Cal.  *Outpatient Bad Debt Appeal-Adm. Dec.* at 7; *Monterey Peninsula* at 735.

The Secretary rejected the hospitals' bad debt claims, finding that "no documentation was submitted as part of the record to support the claims, other than that of the sample reports" and that:

> The Providers acknowledged that, at the time of filing of cost reports the Providers could not identify the amount of the dually eligible patients' coinsurance and deductibles owed by the State and consequently could not document the amount of Medicare bad debt.

*Outpatient Bad Debt Appeal-Adm. Dec.* at 11 (footnotes omitted).  In the absence of any documentary support for the claims at issue, the Secretary stated:

> . . . where a State is liable for all or a portion of the deductible and coinsurance amounts, the State is the responsible party and is to be billed *in order to establish the amount of bad debts owed under Medicare*.

*Id.* at 9 (footnotes omitted) (emphasis added).  Thus, the purpose of the presentation to Medicaid in that case was not, as in the non-ceiling cases, *solely* to make sure that Medicaid did not improperly shift payment responsibility for the Medicare copayments to Medicare.  The Secretary also wanted to assure that the hospitals properly documented the portion of the Medicare bad debt amounts owed by Medicaid so that the amounts owed by Medicare could be determined accurately.

Because the Secretary's policy prior to 1987 was not to limit the documentation that a hospital could use to prove a Medicare bad debt claim for a dually-eligible patient (as confirmed in PRM-II §1102.3L), the Secretary's attempt to use the Administrator's decision in *Outpatient  Bad Debt Appeal* to limit the application of

the long-standing "alternative documentation policy" to the Hospitals' claims must be rejected as a violation of the statutory Bad Debt Moratorium.  This is because the Moratorium explicitly prohibits from making <u>any</u> change to <u>any</u> policy "in effect on August 1, 1987, with respect to payment under [Medicare] to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [Medicare]."

Seeking to avoid the prohibitory effect of the Moratorium on the Secretary's efforts to impose a "mandatory State determination" policy to limit her long-standing "alternative documentation" policy, and to uphold its application retroactively to the claims at issue here in violation of *Georgetown*, *supra*, the Secretary argues that there was a pre-Moratorium "must bill" policy that included the "mandatory State determination" policy and, therefore, that PRM-II §1102.3L. was void *ab initio*:

> Before the moratorium, the Secretary had upheld the must-bill policy through adjudicative proceedings.  Thus, the Secretary had no authority in November 1995 [in PRM-II §1102.3L.] to change the must-bill policy.

Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment [Dkt.18] ("Sec.'s Init. Mem.") at 36.  However, the "must bill/mandatory State determination" policy was *not* established through adjudicative proceedings prior to August 1, 1987.

The two administrative decisions upon which the Secretary purported to rely below[18] did not establish any policy at all, much less one that requires hospitals to obtain a determination from the State to confirm what hospitals already know with respect to the State's lack of financial liability for Medicare copayment bad debts. First, as PRRB decisions, they have no precedential effect on CMS policy.[19] Second, and equally important, the PRRB decisions did not refer to any purported rule.

Further, the decisions did not involve ceiling cases but rather involved the situation where the State had the legal obligation to pay the *entire* Medicare copayment. They did not espouse any requirement that a hospital must obtain a State determination of non-liability in a ceiling case, but rather simply expressed the unremarkable view that, where the State is entirely liable for the Medicare copayment, the hospital may not seek payment from Medicare. Thus, the argument that the

---

[18]  *Id.* (*Concourse Nursing Home v. Travelers Ins. Co*., PRRB Dec. No. 83-D152 (Sept. 27, 1983) (Exh. 1 to Sec.'s Reply Mem.); *St. Joseph Hosp. v. Blue Cross & Blue Shield Assoc./Blue Cross of Georgia/Columbus, Inc.*, PRRB Dec. No. 84-D109 (Apr. 16, 1984) (Exh. 2 to Sec.'s Reply Mem.)).

[19]  *See, e.g., In The Case Of: Marion General Hospital Provider v. Blue Cross And Blue Shield Assn*./ *Trispan Health Services,* Admin. Dec. No. 2007 D8, *reported at* 2007 WL 1004392, at *7 ("Notably, neither the Board, nor the Administrator decisions, are precedential and binding outside the four corners of the particular decision").

"mandatory State determination" policy was in place in August 1987 as part of the "must bill" policy does not withstand scrutiny.[20]

The completely sensible principle, that where Medicaid is entirely liable for the Medicare copayment the hospital cannot simply bypass the State and ask Medicare to pay, has no application to "ceiling" cases (where the State Medicaid program is responsible to pay only part or none of the Medicare copayment). Thus, the Secretary established a documentation policy under which hospitals could show that, instead of the State being entirely liable for the Medicare copayments (as in a non-ceiling case), the State would pay only some or none of the Medicare copayment. Under the "alternative documentation" policy, hospitals had the burden to show that they were entitled to the Medicare bad debts claimed, but *explicitly* were not required to submit bills to the State Medicaid program. The "alternative documentation" policy was confirmed in PRM-II §1102.3L and was in place and fully valid at all times relevant to this case.

Faced with the clear applicability of PRM-II §1102.3L, and the realization that its applicability is fatal to her position, the Secretary strangely asserts that she "had no authority" to issue §1102.3L because of the "must bill" policy (Sec.'s Init. Mem.

---

[20]    For additional argument on this issue before the district court, the Hospitals respectfully refer the Court to the Brief of *Amicus Curiae* Catholic Healthcare West in Support of Plaintiff's [*sic*] Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment [Dkt31].

[Dkt18] at 36).  This argument, however, is a *non-sequitur* because the "must bill" policy and the two PRRB decisions the Secretary cites, even if applicable (which they are not), do not include a "mandatory State determination" requirement.  Further, §1102.3L, presumably vetted by counsel before issuance, did not reference any concern about the Moratorium.[21]  Moreover, the Moratorium was intended to serve as a shield for providers, not as a sword for the Secretary.  *See, e.g., Harris County Hospital District v. Shalala,* 64 F.3d 220, 223 n.11 ("The clear intent of Congress [in enacting the Moratorium] was to prevent the HHS from forcing hospital-providers to change their policies regarding indigency determinations by withholding reimbursement for bad debts.").

Also, the "mandatory State determination" policy is based on the expectation that States will automatically issue payment liability determinations on submitted claims.  This, however, did not occur here and the Secretary's instructions do not address what providers should do when faced by an uncooperative State and, thus, cannot serve as a basis for refusing to pay the claims at issue because she "'entirely failed to consider an important aspect of the problem.'"  *See Summer Hill Nursing LLC v. Sebelius*, 603 F. Supp. 2d 35, 38 (D.D.C. 2009) (citation omitted).

---

[21]  The Secretary's "self-invalidation" argument rings particularly hollow in light of her argument below that courts must give her interpretation of her own regulations "even greater deference than that available under" *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984).  Sec.'s Init. Mem. at 23-24.

In addition to violating the Moratorium, the Secretary's effort to limit the "alternative documentation policy" must be rejected because it is a change in policy that must be adopted in a notice and comment rule under 42 U.S.C. §1395hh(a)(2) (*see also Alaska Professional Hunters Association, Inc. v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999)).  Moreover, even if the Secretary could lawfully limit the "alternative documentation policy," that limitation could not be applied to the Hospitals' claims because doing so would have an unlawful retroactive effect under *Georgetown, supra.*

Based on the foregoing, this Court should find that the "alternative documentation" policy applies to the claims at issue here and not the "mandatory State determination" policy[22] and reverse the district court's judgment because the "mandatory State determination" policy, which was the sole basis for the Secretary's refusal to pay the claims at issue, cannot be applied as a matter of law to the Hospitals' claims.

**B.    The Secretary's Refusal to Pay the Hospitals' Claims Based on the "Mandatory State Determination" Policy Is Arbitrary and Capricious, Not Based On Substantial Evidence, and Otherwise Unlawful Under the APA.**

Assuming for the sake of argument that the Secretary could lawfully apply the "mandatory State determination" policy here, doing so under the facts of this case

---

[22]  Because the Ninth Circuit in *Monterey Peninsula* found that §1102.3L did not apply in that case because it "was not in existence during the relevant period" (*Monterey Peninsula*, at 798-799), the Ninth Circuit's discussion of §1102.3L is mere dicta.

would be arbitrary and capricious, not based on substantial evidence, and otherwise not in accordance with law under the APA. This is primarily because the only purpose for the "mandatory State determination" policy is to assure that the Secretary does not pay for Medicare copayments that are the responsibility of Medi-Cal. That concern does not arise here because the Secretary does not dispute that the Hospitals have sufficiently documented the payments they seek. Also, the Hospitals documented their right to payment for the claims at issue using the same methodology that the Secretary accepted to pay Medicare bad debt claims for other dually-eligible Medi-Cal patients of the Hospitals for services provided during the same time period.

1.    **The Calculation of the Bad Debt Amounts at Issue Is Based Entirely on Information from Medi-Cal and Medicare and Medi-Cal Made the Only "Determination" Necessary to Show That Medicare Owes the Amounts the Hospitals Claim.**

The claims at issue here were part of a much larger universe of claims (*i.e.* claims relating to inpatient services provided to the dually-eligible from May 1, 1994 through April 4, 1999) for which the Secretary paid Medicare bad debts *without* requiring remittance advices. Sec. Dec. at 17 (JAXX). The Secretary had to come up with an alternative to the normal remittance advice process because Medi-Cal refused to issue such advices. Accordingly, instead of issuing remittance advices:

> The State Medi-Cal program furnished reports to the Intermediary that showed the claim comparison of the amount paid by Medicare and the Medicaid payment rate for inpatient dual eligible claims for the time period of May 1, 1994 through April 4, 1999.

*Id.* at 17 (JAXX) (emphasis added).  The "claim comparison of the amount paid by Medicare and the Medicaid payment rate" that was used to calculate the lump-sum payment was based on:

1.    The patient being eligible for Medi-Cal when the services were provided,
2.    The Medi-Cal payment rate on the claim, and
3.    The amount that Medicare paid on the claim.

When determining its financial obligation, Medi-Cal did not "determine" the Medicare payment amount because Medicare determines its own payment.  Thus, this information was supplied by the Secretary.

While Medi-Cal does calculate its own payment, that payment is based on a fixed *per diem* rate set forth in contracts that Medi-Cal enters into with hospitals. Accordingly, it is inaccurate to say that Medi-Cal "determined" the Medicaid payment rates applicable to the lump-sum claims.  It is more accurate to say that Medi-Cal simply applied the rate in effect for the year at issue to the number of days that the patient was in the hospital (the number of days was also supplied by the Secretary).

The only element of the Medi-Cal payment obligation that can reasonably be characterized as an actual "determination" was whether the patient was eligible for Medi-Cal at the time the services were rendered.  As explained in Section V.K.1., above, Medi-Cal eligibility for each of the patients at issue was based on the

determination made by Medi-Cal itself, which the Secretary also does not dispute.[23]
The Medi-Cal calculation of its obligation was otherwise entirely formulaic -- taking
the Medi-Cal payment rate from the hospital contract, multiplying it by the number of
inpatient days from the Secretary's PS&R file, and seeing if the resulting Medi-Cal
payment exceeded the Medicare payment from the Secretary's PS&R file.

Thus, the overwhelming evidence in the record is that Medi-Cal made the only
"determination" necessary to calculate its payment obligation (*i.e*., the patient's
eligibility for Medi-Cal).  Nevertheless, the Secretary states, without any citation or
factual basis: "This case turns on the undisputed fact that there are no determinations
by the State on these claims."  Sec. Dec. at 20 (JAXX).  The Secretary is incorrect
because the record supports the opposite conclusion, *i.e*. that Medi-Cal made the only
determination necessary to establish its obligation for the claims at issue – the rest is
grade school arithmetic.

**2.      The Hospitals Used the Same Methodology that the Secretary Used
to Determine the Payment Due on the Lump-Sum Claims.**

The determination by the Hospitals of Medi-Cal's payment obligation for the
claims at issue was made using the same methodology that the Secretary used to
determine Medi-Cal's payment obligation for the lump-sum claims.  PRRB Dec. at 6

---

[23] *Grossmont Hospital Corp., et al. v. Sebelius*, 903 F. Supp. 2d 39, 53 n.5 (D.D.C.
2012) ("Insofar as the Secretary does not dispute the Providers' position or the
reliability of the [Hospitals' Medicaid eligibility] information, the Court presumes the
accuracy of the data for purposes of this decision.").

(JAXX).  This is why the Secretary's contractor stipulated before the PRRB that the Hospitals "supplied sufficient documentation to support their methodology for determining the bad debt amounts for each year under appeal." AR308 (JAXX).  The Secretary does not dispute the amount being claimed.[24]  Hence, the PRRB held:

> After considering the Medicare law and program instructions, the evidence and parties' contentions, the Board finds and concludes that <u>the Intermediary improperly disallowed the Providers' claim for Medicare bad debts</u>. . . .

> Thus, the Board concludes that <u>the Providers complied with the Medicare billing requirements</u>. . . .

> The Board finds that based on the Agreement, the process of automatic transfer of claims data and accountability of bad debts in the PS&R reports<u>, the Intermediary could easily determine the amounts which the state is not obligated to pay</u>.

PRRB Dec. at 8-9 (JAXX-XX) (emphasis added).

Nevertheless, the Secretary is refusing to pay the claims at issue because the Hospitals "did not receive a determination from [Medi-Cal] on the amount of the [Medi-Cal] obligation on the claims at issue."  Sec. Dec. at 20 (JAXX).  The Secretary's position is rational only if a Medi-Cal determination is necessary in order

---

[24] The Secretary states on page 28, n. 13, of her Initial Memorandum:  "Plaintiffs imply that the Secretary does not dispute the amounts at issue.  <u>See</u> Pl. [*sic*] Br. at 29.  Because the State must make the required determinations of payment responsibility, the Secretary does not reach this question.  Plaintiffs' alleged absence of a 'dispute' over the amounts claimed does not mean that the Secretary affirmatively agrees that those amounts are accurate."  The Secretary thus, *ipso facto*, concedes the "absence" of a dispute about the amounts the Hospitals claim.

to determine Medi-Cal's payment obligation for the claims at issue.  It is not, which the Secretary has conceded by not disputing the amounts at issue.  Thus, the Secretary's refusal to pay the claims at issue based on the alleged lack of a Medi-Cal determination of its payment obligation is arbitrary and capricious and not supported by substantial evidence in that the record, which shows that the Secretary paid the lump-sum claims based on the same information that the Hospitals provided for the claims at issue.

**C.      The Hospitals' Claims Must be Paid Under JSM-370**

JSM-370 "held harmless" bad debt claims where the Secretary's contractor "followed the now-obsolete Section 1102.3L instructions for cost reporting periods prior to January 1, 2004."  (AR384 (JAXX)).  Nevertheless, the Secretary held that the Hospitals "do not meet the hold harmless provisions" of JSM-370.  Sec. Dec. at 21 (JAXX).

It is arbitrary and capricious for the Secretary to have made the lump-sum payments for the vast majority of the claims in the universe at issue based on PRM §1102.3.L and then to refuse to hold the Hospitals harmless under JSM-370 for the balance of the claims in that universe, where the record in this action shows that (i) the Hospitals provided documentation for the claims that "followed the same process that appeared to have been followed" by the Secretary's contractor when making the lump sum settlement payment, and (ii) the Secretary's contractor stipulated that the

Hospitals "supplied sufficient documentation to support their methodology for determining the bad debt amounts for each year under appeal" (AR308 (JAXX)).

Moreover, JSM-370 is properly read as a concession by the Secretary that (a) PRM-II §1102.3.L was, in fact, valid and legally enforceable, even after it was deleted from the PRM, and (b) hospitals could reasonably rely on it. Because §1102.3.L was valid and enforceable policy at all times relevant here, the Secretary cannot refuse to adhere to it until such time as it has been replaced by a different, valid policy, which did not occur here, if at all, until long after the claims at issue arose and any such change cannot be applied retroactively. *See Alaska Hunters* and *Georgetown, supra*. Moreover, the Secretary acts arbitrarily and capriciously by asserting that her contractors can lawfully refuse to apply a valid and enforceable policy to some hospitals, while others are paid under that same policy.

**D.    The District Court Erred By Refusing to Consider the Hospitals' Argument that the "Mandatory State Determination" Policy Violates the Bad Debt Moratorium.**

The district court refused to consider the Hospitals' primary argument (and the supporting arguments made by the district court *amicus*) that the "mandatory State determination" policy "is invalid on its face because it violates Congress' 'Bad Debt Moratorium'" because the Hospitals allegedly "failed to raise this argument whatsoever during the administrative proceedings below" and "the Administrator did not render any determination as to the moratorium's impact on the Secretary's 'must

bill' policy." *Grossmont* at 48-49. This holding lacks a basis in fact and law, primarily because (a) the Secretary first raised the moratorium in reversing the PRRB, thus opening the door to this issue (*see, e.g.,* Sec. Dec. at 4, 12, and 14 n.14, ),[25] (b) the Secretary did not object in the district court to the Hospitals' moratorium argument, thereby waiving any objection to the Hospitals' raising it (this also explains why this issue was not briefed before the district court), and (c) the Secretary fully briefed the moratorium issue below (Sec.'s Init. Mem. at 35-39; Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Response to Brief of Amicus Curiae Catholic Healthcare West in Support of Plaintiffs [Dkt24] at 4-8).

Moreover, because the district court itself accepted the Secretary's argument concerning the effect of the moratorium by holding that PRM-II §1102.3L cannot be enforced because it [allegedly] "conflicts with the 'must bill' policy," the court was precluded from refusing to consider the arguments of the Hospitals and the amicus on the same subject. *Id.* at 43.

Finally, the district court erred, and this Court must consider the arguments relating to the applicability of the moratorium, for the sake of justice and the complete

---

[25] *Cf. Schering Corp. v. Illinois Antibiotics Co.*, 89 F.3d 357, 358 (7th Cir. 1996) ("We certainly agree that the failure of an appellee [that was successful below, as the Hospitals prevailed at the PRRB] to have raised all possible alternative grounds for affirming the district court's original decision, unlike an appellant's failure to raise all possible grounds for reversal, should not operate as a waiver.").

consideration of the legality of the Secretary's "must bill" policy.[26]  This is particularly so in light of the intent of Congress in the Bad Debt Moratorium, to "prevent the [Secretary] from forcing hospital-providers to change their policies regarding indigency determinations by withholding reimbursement for bad debts." *Harris County Hospital District v. Shalala, supra*, at 223 n.11.

## IX.  CONCLUSION

For the foregoing reasons, the district court's judgment should be reversed.

Respectfully submitted,

Dated:  June 26, 2014            /s/ Robert L. Roth
Robert L. Roth (D.C. Bar No. 441803)
HOOPER, LUNDY & BOOKMAN, P.C.
401 9th Street, N.W., Suite 550
Washington, D.C.  20004-2141
Tel:  (202) 580-7701
Fax:  (202) 580-7719
Email:  rroth@health-law.com

John R. Hellow
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, California  90067
Tel:  (310) 551-8155
Fax:  (310) 551-8181
Email: jhellow@health-law.com

Attorneys of Record for Appellants
Grossmont Hospital Corporation, *et al.*

---

[26]  S*ee Hormel v. Helvering*, 312 U.S. 552, 557-58 (1941) ("Rules of practice and procedure are devised to promote the ends of justice, not to defeat them.").

## <u>CERTIFICATE OF COMPLIANCE</u>

I HEREBY CERTIFY pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) that the foregoing Brief complies with the type-volume limitation of 14,000 words set forth in Rule 32(a)(7)(B), in that it contains 13,808 words in content.

Dated:  June 26, 2014         /s/ Robert L. Roth
                              Robert L. Roth
                              Attorney for Appellants

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 26th day of June 2014, I served the foregoing Appellant's Brief and Addendum electronically upon the following counsel of record for Appellee:

Sydney Foster, Esq.
Civil Division, Appellate Staff
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 7258
Washington, D.C.  20530
Telephone:  (202) 616-5374
Fax:  (202) 514-8151
Email:  sydney.foster@usdoj.gov

Michael S. Raab, Esq.
Civil Division, Appellate Staff
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 7258
Washington, D.C.  20530
Telephone:  (202) 514-4053
Fax:  (202) 514-8151
Email:  michael.raab@usdoj.gov

R. Craig Lawrence, Esq.
Civil Division
U.S. Attorney's Office
United States Department of Justice
555 4th Street, NW
Washington, D.C.  20530
Telephone:  (202) 514-7159
Fax:  (202) 514-7964
Email:  craig.lawrence@usdoj.gov

_____ /s/ Robert L. Roth _____
Robert L. Roth
Attorney for Appellants

# ADDENDUM

## Table of Contents

                                                                    Page

**Statutes**

5 U.S.C. §706 ...................................................................ADD-1

42 U.S.C. §1395x(v)(1)(A) ...............................................ADD-2

42 U.S.C. §1395hh ...........................................................ADD-4

42 U.S.C. §1395oo ...........................................................ADD-8

Omnibus Budget Reconciliation Act of 1987, Pub. L.
No. 100-203, sec. 4008(c), 101 Stat. 1330-55, as
amended by the Technical Miscellaneous Revenue Act
of 1988, Pub. L. No. 100-647, sec. 8402, 102 Stat.
3798, and as further amended by the Omnibus Budget
Reconciliation Act of 1989, Pub. L. No. 101-239, sec.
6023, 103 Stat. 2176 (codified as a note to 42 U.S.C.
§1395f (1992)) ...............................................................ADD-12

**Regulations**

42 C.F.R. §405.1851...........................................................ADD-13

42 C.F.R. §413.89...............................................................ADD-14

TITLE 5--GOVERNMENT ORGANIZATION AND EMPLOYEES

PART I--THE AGENCIES GENERALLY

CHAPTER 7--JUDICIAL REVIEW

Sec. 706. Scope of review

    To the extent necessary to decision and when presented, the
reviewing court shall decide all relevant questions of law, interpret
constitutional and statutory provisions, and determine the meaning or
applicability of the terms of an agency action. The reviewing court
shall--
        (1) compel agency action unlawfully withheld or unreasonably
    delayed; and
        (2) hold unlawful and set aside agency action, findings, and
    conclusions found to be--
            (A) arbitrary, capricious, an abuse of discretion, or
        otherwise not in accordance with law;
            (B) contrary to constitutional right, power, privilege, or
        immunity;
            (C) in excess of statutory jurisdiction, authority, or
        limitations, or short of statutory right;
            (D) without observance of procedure required by law;
            (E) unsupported by substantial evidence in a case subject to
        sections 556 and 557 of this title or otherwise reviewed on the
        record of an agency hearing provided by statute; or
            (F) unwarranted by the facts to the extent that the facts
        are subject to trial de novo by the reviewing court.


In making the foregoing determinations, the court shall review the whole
record or those parts of it cited by a party, and due account shall be
taken of the rule of prejudicial error.

ADD-1

TITLE 42--THE PUBLIC HEALTH AND WELFARE

CHAPTER 7--SOCIAL SECURITY

SUBCHAPTER XVIII--HEALTH INSURANCE FOR AGED AND DISABLED

Part E--Miscellaneous Provisions

Sec. 1395x. Definitions

. . . .

(v) Reasonable costs

(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by

individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

ADD-3

# Social Security Act, Amended, Sec. 1871. [42 U.S.C. §1395hh]

## Regulations

(a)

(1) The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this title. When used in this title, the term "regulations" means, unless the context otherwise requires, regulations prescribed by the Secretary.

(2) No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this title shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

(3)

(A) The Secretary, in consultation with the Director of the Office of Management and Budget, shall establish and publish a regular timeline for the publication of final regulations based on the previous publication of a proposed regulation or an interim final regulation.

(B) Such timeline may vary among different regulations based on differences in the complexity of the regulation, the number and scope of comments received, and other relevant factors, but shall not be longer than 3 years except under exceptional circumstances. If the Secretary intends to vary such timeline with respect to the publication of a final regulation, the Secretary shall cause to have published in the Federal Register notice of the different timeline by not later than the timeline previously established with respect to such regulation. Such notice shall include a brief explanation of the justification for such variation.

(C) In the case of interim final regulations, upon the expiration of the regular timeline established under this paragraph for the publication of a final regulation after opportunity for public comment, the interim final regulation shall not continue in effect unless the Secretary publishes (at the end of the regular timeline and, if applicable, at the end of each succeeding 1-year period) a notice of continuation of the regulation that includes an explanation of why the regular timeline (and any subsequent 1-year extension) was not complied with. If such a notice is published, the regular timeline (or such timeline as previously extended under this paragraph) for publication of the final regulation shall be treated as having been extended for 1 additional year.

(D) The Secretary shall annually submit to Congress a report that describes the instances in which the Secretary failed to publish a final regulation within the applicable regular timeline under this paragraph and that provides an explanation for such failures.

ADD-4

(4) If the Secretary publishes a final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation.

(b)

(1) Except as provided in paragraph (2), before issuing in final form any regulation under subsection (a), the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon.

(2) Paragraph (1) shall not apply where—

(A) a statute specifically permits a regulation to be issued in interim final form or otherwise with a shorter period for public comment,

(B) a statute establishes a specific deadline for the implementation of a provision and the deadline is less than 150 days after the date of the enactment of the statute in which the deadline is contained, or

(C) subsection (b) of section 553 of title 5, United States Code, does not apply pursuant to subparagraph (B) of such subsection.

(c)

(1) The Secretary shall publish in the Federal Register, not less frequently than every 3 months, a list of all manual instructions, interpretative rules, statements of policy, and guidelines of general applicability which—

(A) are promulgated to carry out this title, but

(B) are not published pursuant to subsection (a)(1) and have not been previously published in a list under this subsection.

(2) Effective June 1, 1988, each fiscal intermediary and carrier administering claims for extended care, post-hospital extended care, home health care, and durable medical equipment benefits under this title shall make available to the public all interpretative materials, guidelines, and clarifications of policies which relate to payments for such benefits.

(3) The Secretary shall to the extent feasible make such changes in automated data collection and retrieval by the Secretary and fiscal intermediaries with agreements under section 1816 as are necessary to make easily accessible for the Secretary and other appropriate parties a data base which fairly and accurately reflects the provision of extended care, post-hospital extended care and home health care benefits pursuant to this title, including such categories as benefit denials, results of appeals, and other relevant factors, and selectable by such categories and by fiscal intermediary, service provider, and region.

(e)

(1)

(A) [sic] A substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability under this title shall not be applied (by extrapolation or otherwise) retroactively to items and services furnished before the effective date of the change, unless the Secretary determines that—

(i) such retroactive application is necessary to comply with statutory requirements; or

(ii) failure to apply the change retroactively would be contrary to the public interest.

(B)

(i) Except as provided in clause (ii), a substantive change referred to in subparagraph (A) shall not become effective before the end of the 30-day period that begins on the date that the Secretary has issued or published, as the case may be, the substantive change.

(ii) The Secretary may provide for such a substantive change to take effect on a date that precedes the end of the 30-day period under clause (i) if the Secretary finds that waiver of such 30-day period is necessary to comply with statutory requirements or that the application of such 30-day period is contrary to the public interest. If the Secretary provides for an earlier effective date pursuant to this clause, the Secretary shall include in the issuance or publication of the substantive change a finding described in the first sentence, and a brief statement of the reasons for such finding.

(C) No action shall be taken against a provider of services or supplier with respect to noncompliance with such a substantive change for items and services furnished before the effective date of such a change.

(2)

(A) If—

(i) a provider of services or supplier follows the written guidance (which may be transmitted electronically) provided by the Secretary or by a medicare contractor (as defined in section 1889(g)) acting within the scope of the contractor's contract authority, with respect to the furnishing of items or services and submission of a claim for benefits for such items or services with respect to such provider or supplier;

(ii) the Secretary determines that the provider of services or supplier has accurately presented the circumstances relating to such items, services, and claim to the contractor in writing; and

(iii) the guidance was in error;

ADD-6

the provider of services or supplier shall not be subject to any penalty or interest under this title or the provisions of title XI insofar as they relate to this title (including interest under a repayment plan under section 1893 or otherwise) relating to the provision of such items or service or such claim if the provider of services or supplier reasonably relied on such guidance.

(B) Subparagraph (A) shall not be construed as preventing the recoupment or repayment (without any additional penalty) relating to an overpayment insofar as the overpayment was solely the result of a clerical or technical operational error.

(f)

(1) Not later than 2 years after the date of the enactment of this subsection, and every 3 years thereafter, the Secretary shall submit to Congress a report with respect to the administration of this title and areas of inconsistency or conflict among the various provisions under law and regulation.

(2) In preparing a report under paragraph (1), the Secretary shall collect—

(A) information from individuals entitled to benefits under part A or enrolled under part B, or both, providers of services, and suppliers and from the Medicare Beneficiary Ombudsman with respect to such areas of inconsistency and conflict; and

(B) information from medicare contractors that tracks the nature of written and telephone inquiries.

(3) A report under paragraph (1) shall include a description of efforts by the Secretary to reduce such inconsistency or conflicts, and recommendations for legislation or administrative action that the Secretary determines appropriate to further reduce such inconsistency or conflicts.

TITLE 42--THE PUBLIC HEALTH AND WELFARE

CHAPTER 7--SOCIAL SECURITY

SUBCHAPTER XVIII--HEALTH INSURANCE FOR AGED AND DISABLED

Part E--Miscellaneous Provisions

Sec. 1395oo. Provider Reimbursement Review Board

(a) Establishment

    Any provider of services which has filed a required cost report
within the time specified in regulations may obtain a hearing with
respect to such cost report by a Provider Reimbursement Review Board
(hereinafter referred to as the ``Board'') which shall be established by
the Secretary in accordance with subsection (h) of this section and
(except as provided in subsection (g)(2) of this section) any hospital
which receives payments in amounts computed under subsection (b) or (d)
of section 1395ww of this title and which has submitted such reports
within such time as the Secretary may require in order to make payment
under such section may obtain a hearing with respect to such payment by
the Board, if--
    (1) such provider--
        (A)(i) is dissatisfied with a final determination of the
    organization serving as its fiscal intermediary pursuant to
    section 1395h of this title as to the amount of total program
    reimbursement due the provider for the items and services
    furnished to individuals for which payment may be made under
    this subchapter for the period covered by such report, or
        (ii) is dissatisfied with a final determination of the
    Secretary as to the amount of the payment under subsection (b)
    or (d) of section 1395ww of this title,
        (B) has not received such final determination from such
    intermediary on a timely basis after filing such report, where
    such report complied with the rules and regulations of the
    Secretary relating to such report, or
        (C) has not received such final determination on a timely
    basis after filing a supplementary cost report, where such cost
    report did not so comply and such supplementary cost report did
    so comply,

    (2) the amount in controversy is $10,000 or more, and
    (3) such provider files a request for a hearing within 180 days
after notice of the intermediary's final determination under
paragraph (1)(A)(i), or with respect to appeals under paragraph
(1)(A)(ii), 180 days after notice of the Secretary's final
determination, or with respect to appeals pursuant to paragraph (1)

(B) or (C), within 180 days after notice of such determination would have been received if such determination had been made on a timely basis.

(b) Appeals by groups

The provisions of subsection (a) of this section shall apply to any group of providers of services if each provider of services in such group would, upon the filing of an appeal (but without regard to the $10,000 limitation), be entitled to such a hearing, but only if the matters in controversy involve a common question of fact or interpretation of law or regulations and the amount in controversy is, in the aggregate, $50,000 or more.

(c) Right to counsel; rules of evidence

At such hearing, the provider of services shall have the right to be represented by counsel, to introduce evidence, and to examine and cross-examine witnesses. Evidence may be received at any such hearing even though inadmissible under rules of evidence applicable to court procedure.

(d) Decisions of Board

A decision by the Board shall be based upon the record made at such hearing, which shall include the evidence considered by the intermediary and such other evidence as may be obtained or received by the Board, and shall be supported by substantial evidence when the record is viewed as a whole. The Board shall have the power to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination.

(e) Rules and regulations

The Board shall have full power and authority to make rules and establish procedures, not inconsistent with the provisions of this subchapter or regulations of the Secretary, which are necessary or appropriate to carry out the provisions of this section. In the course of any hearing the Board may administer oaths and affirmations. The provisions of subsections (d) and (e) of section 405 of this title with respect to subpenas shall apply to the Board to the same extent as they apply to the Secretary with respect to subchapter II of this chapter.

(f) Finality of decision; judicial review; determinations of Board authority; jurisdiction; venue; interest on amount in controversy

(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final

decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) of this section and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5 notwithstanding any other provisions in section 405 of this title. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) of this section must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

(2) Where a provider seeks judicial review pursuant to paragraph (1), the amount in controversy shall be subject to annual interest beginning on the first day of the first month beginning after the 180-day period as determined pursuant to subsection (a)(3) of this section and equal to the rate of interest on obligations issued for purchase by the Federal Hospital Insurance Trust Fund for the month in which the civil action authorized under paragraph (1) is commenced, to be awarded by the reviewing court in favor of the prevailing party.

(3) No interest awarded pursuant to paragraph (2) shall be deemed income or cost for the purposes of determining reimbursement due providers under this chapter.

(g) Certain findings not reviewable

(1) The finding of a fiscal intermediary that no payment may be made under this subchapter for any expenses incurred for items or services furnished to an individual because such items or services are listed in section 1395y of this title shall not be reviewed by the Board, or by any court pursuant to an action brought under subsection (f) of this section.

(2) The determinations and other decisions described in section 1395ww(d)(7) of this title shall not be reviewed by the Board or by any court pursuant to an action brought under subsection (f) of this section or otherwise.

(h) Composition and compensation

   The Board shall be composed of five members appointed by the Secretary without regard to the provisions of title 5 governing appointments in the competitive services. Two of such members shall be representative of providers of services. All of the members of the Board shall be persons knowledgeable in the field of payment of providers of services, and at least one of them shall be a certified public accountant. Members of the Board shall be entitled to receive compensation at rates fixed by the Secretary, but not exceeding the rate specified (at the time the service involved is rendered by such members) for grade GS-18 in section 5332 of title 5. The term of office shall be three years, except that the Secretary shall appoint the initial members of the Board for shorter terms to the extent necessary to permit staggered terms of office.

(i) Technical and clerical assistance

   The Board is authorized to engage such technical assistance as may be required to carry out its functions, and the Secretary shall, in addition, make available to the Board such secretarial, clerical, and other assistance as the Board may require to carry out its functions.

(j) ``Provider of services'' defined

   In this section, the term ``provider of services'' includes a rural health clinic and a Federally qualified health center.

Pub. L. 111–148, title VI, §6407(d), Mar. 23, 2010, 124 Stat. 770, provided that: "The requirements pursuant to the amendments made by subsections (a) [amending this section and section 1395n of this title] and (b) [amending section 1395m of this title] shall apply in the case of physicians making certifications for home health services under title XIX of the Social Security Act [42 U.S.C. 1396 et seq.] in the same manner and to the same extent as such requirements apply in the case of physicians making such certifications under title XVIII of such Act [42 U.S.C. 1395 et seq.]."

STUDY AND REPORT ON EFFECT OF 2000 AMENDMENT

Pub. L. 106–554, §1(a)(6) [title V, §507(b)], Dec. 21, 2000, 114 Stat. 2763, 2763A–532, provided that:

"(1) IN GENERAL.—The Comptroller General of the United States shall conduct an evaluation of the effect of the amendment [amending this section and section 1395n of this title] on the cost of and access to home health services under the medicare program under title XVIII of the Social Security Act [this subchapter].

"(2) REPORT.—Not later than 1 year after the date of the enactment of this Act [Dec. 21, 2000], the Comptroller General shall submit to Congress a report on the study conducted under paragraph (1)."

STUDY AND REPORT ON PHYSICIAN CERTIFICATION REQUIREMENT FOR HOSPICE BENEFITS

Pub. L. 106–554, §1(a)(6) [title III, §322(b)], Dec. 21, 2000, 114 Stat. 2763, 2763A–501, provided that:

"(1) STUDY.—The Secretary of Health and Human Services shall conduct a study to examine the appropriateness of the certification regarding terminal illness of an individual under section 1814(a)(7) of the Social Security Act [42 U.S.C. 1395f(a)(7)] that is required in order for such individual to receive hospice benefits under the medicare program under title XVIII of such Act [this subchapter]. In conducting such study, the Secretary shall take into account the effect of the amendment made by subsection (a) [amending this section].

"(2) REPORT.—Not later than 2 years after the date of the enactment of this Act [Dec. 21, 2000], the Secretary of Health and Human Services shall submit to Congress a report on the study conducted under paragraph (1), together with any recommendations for legislation that the Secretary deems appropriate."

TEMPORARY INCREASE IN PAYMENT FOR HOSPICE CARE

Pub. L. 106–554, §1(a)(6) [title III, §321(c)], Dec. 21, 2000, 114 Stat. 2763, 2763A–501, provided that: "The provisions of this section and the enacting provisions set out as a note under this section] shall have no effect on the application of section 131 of BBRA [Pub. L. 106–113, §1000(a)(6) [title I, §131], set out as a note below]."

Pub. L. 106–113, div. B, §1000(a)(6) [title I, §131], Nov. 29, 1999, 113 Stat. 1536, 1501A–333, provided that:

"(a) INCREASE FOR FISCAL YEARS 2001 AND 2002.—For purposes of payments under section 1814(i)(1)(C) of the Social Security Act (42 U.S.C. 1395f(i)(1)(C)) for hospice care furnished during fiscal years 2001 and 2002, the Secretary of Health and Human Services shall increase the payment rate in effect (but for this section) for—

"(1) fiscal year 2001, by 0.5 percent, and

"(2) fiscal year 2002, by 0.75 percent.

"(b) ADDITIONAL PAYMENT NOT BUILT INTO THE BASE.—The Secretary of Health and Human Services shall not include any additional payment made under this subsection (a) in updating the payment rate, as increased by the applicable market basket percentage increase for the fiscal year involved under section 1814(i)(1)(C)(ii) of that Act (42 U.S.C. 1395f(i)(1)(C)(ii))."

STUDY AND REPORT TO CONGRESS REGARDING MODIFICATION OF PAYMENT RATES FOR HOSPICE CARE

Pub. L. 106–113, div. B, §1000(a)(6) [title I, §132], Nov. 29, 1999, 113 Stat. 1536, 1501A–333, provided that:

"(a) STUDY.—The Comptroller General of the United States shall conduct a study to determine the feasibil-

ity and advisability of updating the payment rates and the cap amount determined with respect to a fiscal year under section 1814(i) of the Social Security Act (42 U.S.C. 1395f(i)) for routine home care and other services included in hospice care. Such study shall examine the cost factors used to determine such rates and such amount and shall evaluate whether such factors should be modified, eliminated, or supplemented with additional cost factors.

"(b) REPORT.—Not later than one year after the date of enactment of this Act [Nov. 29, 1999], the Comptroller General of the United States shall submit to Congress a report on the study conducted under subsection (a), together with any recommendations for legislation that the Comptroller General determines to be appropriate as a result of such study."

STUDY OF METHODS TO COMPENSATE HOSPICES FOR HIGH-COST CARE

Section 6016 of Pub. L. 101–239 directed Secretary of Health and Human Services to conduct a study of high-cost hospice care provided to medicare beneficiaries under the medicare program, evaluate the ability of hospice programs participating in the medicare program to provide such high-cost care to such patients, develop methods to compensate such programs for providing such high-cost care, and submit, not later than Apr. 1, 1991, a report to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate on the study, including in the report any recommendations developed by the Secretary to compensate hospice programs for providing high-cost hospice care to medicare beneficiaries.

CONTINUATION OF BAD DEBT RECOGNITION FOR HOSPITAL SERVICES

Section 4008(c) of Pub. L. 100–203, as amended by Pub. L. 100–647, title VIII, §8402, Nov. 10, 1987, 102 Stat. 3798; Pub. L. 101–239, title VI, §6023(a), Dec. 19, 1989, 103 Stat. 2167, provided that: "In making payments to hospitals under title XVIII of the Social Security Act [this subchapter], the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment under title XVIII of the Social Security Act to providers of service for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under such title (including criteria for what constitutes a reasonable collection effort, including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency). The Secretary may not require a hospital to change its bad debt collection policy if a fiscal intermediary, in accordance with the rules in effect as of August 1, 1987, with respect to criteria for indigency determination procedures, record keeping, and determining whether to refer a claim to an external collection agency, has accepted such policy before that date, and the Secretary may not collect from the hospital on the basis of an expectation of a change in the hospital's collection policy."

[Section 6023(b) of Pub. L. 101–239 provided that: "The amendment made by subsection (a) [amending section 4008(c) of Pub. L. 100–203, set out above] shall take effect as if included in the enactment of the Omnibus Budget Reconciliation Act of 1987 [Pub. L. 100–203]."]

[Pub. L. 100–647, title VIII, §8402, Nov. 10, 1988, 102 Stat. 3798, provided that amendment of section 4008(c) of Pub. L. 100–203, set out above, by section 8402 of Pub. L. 100–647 is effective as of date of enactment of Omnibus Budget Reconciliation Act of 1987, Pub. L. 100–203, which was approved Dec. 22, 1987.]

PROVIDERS OF SERVICES TO CALCULATE AND REPORT LESSER-OF-COST-OR-CHARGES DETERMINATIONS SEPARATELY WITH RESPECT TO PAYMENTS UNDER PARTS A AND B OF THIS SUBCHAPTER; ISSUANCE OF REGULATIONS

Section 2308(a) of Pub. L. 98–369 provided that: "The Secretary of Health and Human Services shall issue



Centers for Medicare & Medicaid Services, HHS                    §405.1853

§405.1851   Conduct of Board hearing.

The Board hearing shall be open to the parties, to representatives of the Centers for Medicare & Medicaid Services, and to such other persons as the Board deems necessary and proper. The Board shall inquire fully into all of the matters at issue and shall receive into evidence the testimony of witnesses and any documents which are relevant and material to such matters. If the Board believes that there is relevant and material evidence available which has not been presented at the hearing, it may at any time prior to the mailing of notice of the decision, reconvene the hearing for the receipt of such evidence. The order in which the evidence and the allegations shall be presented and the conduct of the hearing shall be at the discretion of the Board.

§405.1853   Board proceedings prior to any hearing; discovery.

(a) *Preliminary narrowing of the issues.* Upon receiving notification that a request for a Board hearing is submitted, the intermediary must—

(1) Promptly review both the materials submitted with the provider hearing request, and the information underlying each intermediary or Secretary determination for each cost reporting period under appeal;

(2) Expeditiously attempt to join with the provider in resolving specific factual or legal issues and submitting to the Board written stipulations setting forth the specific issues that remain for Board resolution based on the review; and

(3) Ensure that the evidence it considered in making its determination, or, where applicable, the evidence the Secretary considered in making his or her determination, is included in the record.

(b) *Position papers.* (1) After any preliminary narrowing of the issues, the parties must file position papers in order to narrow the issues further. In each case, and as appropriate, the Board establishes the deadlines as to when the provider(s) and the intermediary must submit position papers to the Board.

(2) The Board has the discretion to extend the deadline for submitting a position paper. Each position paper must set forth the relevant facts and arguments regarding the Board's jurisdiction over each remaining matter at issue in the appeal (as described in §405.1840 of this subpart), and the merits of the provider's Medicare payment claims for each remaining issue.

(3) In the absence of a Board order or general instructions to the contrary, any supporting exhibits regarding Board jurisdiction must accompany the position paper. Exhibits regarding the merits of the provider's Medicare payment claims may be submitted in a timeframe to be decided by the Board through a schedule applicable to a specific case or through general instructions.

(c) *Initial status conference.* (1) Upon review of the parties' position papers, one or more members of the Board may conduct an initial status conference. An initial status conference may be conducted in person or telephone, at the discretion of the Board.

(2) The Board may use the status conference to discuss any of the following:

(i) Simplification of the issues.

(ii) The necessity or desirability of amendments to the pleadings, including the need for a more definite statement.

(iii) Stipulations and admissions of fact or as to the content and authenticity of documents.

(iv) Whether the parties can agree to submission of the case on a stipulated record.

(v) Whether a party may waive appearance at an oral hearing and submit only documentary evidence (the admissibility of which is subject to objection from other parties) and written argument.

(vi) Limitation of the number of witnesses.

(vii) Scheduling dates for the exchange of witness lists and of proposed exhibits.

(viii) Discovery as permitted under this section.

(ix) The time and place for the hearing.

(x) Potential settlement of some or all of the issues.

(xi) Other matters that the Board deems necessary and appropriate. The

241

ADD-13

## 42 C.F.R. §413.89
## Bad Debts, Charity, and Courtesy Allowances

(a)     *Principle*:

Bad debts, charity, and courtesy allowances are deductions from revenue and are not to be included in allowable cost. However, subject to the limitations described under paragraph (h) of this section and the exception for services described under paragraph (i) of this section, bad debts attributable to the deductibles and coinsurance amounts are reimbursable under the program.

(b)     *Definitions*:

(1)     *Bad debts.* — Bad debts are amounts considered to be uncollectible from accounts and notes receivable which were created or acquired in providing services. "Accounts receivable" and "notes receivable" are designations for claims arising from the rendering of services, and are collectible in money in the relatively near future.

(2)     *Charity allowances.* — Charity allowances are reductions in charges made by the provider of services because of the indigence or medical indigence of the patient. Cost of free care (uncompensated services) furnished under a Hill-Burton obligation are considered as charity allowances.

(3)     *Courtesy allowances.* — Courtesy allowances indicate a reduction in charges in the form of an allowance to physicians, clergy, members of religious orders, and other as approved by the governing body of the provider, for services received from the provider. Employee fringe benefits, such as hospitalization and personnel health programs, are not considered to be courtesy allowances.

(c)     *Normal accounting treatment: reduction in revenue*:

Bad debts, charity, and courtesy allowances represent reductions in revenue. The failure to collect charges for services rendered does not add to the cost of providing the services. Such costs have already been incurred in the production of the services.

(d)     *Requirements for Medicare*:

Under Medicare, costs of covered services furnished beneficiaries are not be to borne by individuals not covered by the Medicare program, and conversely, costs of services provided for other than beneficiaries are not to be borne by the health insurance program. Uncollected revenue related to services rendered to beneficiaries of the program generally means the provider has not recovered the cost of services covered by that revenue. The failure of beneficiaries to pay the deductible and coinsurance amounts can result in the related costs of covered services being borne by other than Medicare beneficiaries. To assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts which remain unpaid are added to the Medicare share of allowable costs. Bad debts arising from other sources are not allowable costs.

(e)    *Criteria for allowable bad debt:*

A bad debt must meet the following criteria to be allowable:

(1)    The debt must be related to covered services and derived from deductible and coinsurance amounts.

(2)    The provider must be able to establish that reasonable collection efforts were made.

(3)    The debt was actually uncollectible when claimed as worthless.

(4)    Sound business judgment established that there was no likelihood of recovery at any time in the future.

(f)    *Charging of bad debts and bad debt recoveries:*

The amounts uncollectible from specific beneficiaries are to be charged off as bad debts in the accounting period in which the accounts are deemed to be worthless. In some cases an amount previously written off as a bad debt and allocated to the program may be recovered in a subsequent accounting period; in such cases the income therefrom must be used to reduce the cost of beneficiary services for the period in which the collection is made.

(g)    *Charity allowances:*

Charity allowances have no relationship to beneficiaries of the Medicare program and are not allowable costs. These charity allowances include the costs of uncompensated services furnished under a Hill-Burton obligation. (Note: In accordance with Sec. 106(b) of Pub. L. 97-248 (enacted September 3, 1982), this sentence is effective with respect to any costs incurred under Medicare, except that it does not apply to costs which have been allowed prior to September 3, 1982, pursuant to a final court order affirmed by a United States Court of Appeals.) The cost to the provider of employee fringe-benefit programs is an allowable element of reimbursement.

(h)    *Limitations on bad debts:*

(1)    *Hospitals.*— In determining reasonable costs for hospitals, the amount of bad debt otherwise treated as allowable costs (as defined in paragraph (e) of this section) is reduced—

(i)    For cost reporting periods beginning during fiscal year 1998, by 25 percent;

(ii)    For cost reporting periods beginning during fiscal year 1999, by 40 percent;

(iii)    For cost reporting periods beginning during fiscal year 2000, by 45 percent; and

(iv)    For cost reporting periods beginning during a subsequent fiscal year, by 30 percent.

(2)    *Skilled nursing facilities.* — For cost reporting periods beginning during fiscal year 2006 or during a subsequent fiscal year, the amount of skilled nursing facility bad debts for coinsurance otherwise treated as allowable costs (as defined in paragraph (e) of this section) for services furnished to a patient who is not a dual eligible individual is reduced by 30 percent. A dual

1098727.1

2

ADD-15

eligible individual is defined for this section as an individual that is entitled to benefits under Part A of Medicare and is determined eligible by the State for medical assistance under Title XIX of the Act as described under paragraph (2) of the definition of a "full-benefit dual eligible individual" at §423.772 of this chapter.

    (3)   *ESRD facilities —*

        (i)   *Limitation on bad debt.*—The amount of ESRD facility bad debts otherwise treated as allowable costs described in §413.178.

        (ii)  *Exception.*— Bad debts arising from covered services paid under a reasonable charge-based methodology or a fee schedule are not reimbursable under the program. Additional exceptions for ESRD bad debt payments are described in §413.178(d).

(i)   *Exception*;

    Bad debts arising from covered services paid under a reasonable charge-based methodology or a fee schedule are not reimbursable under the program.

*Source*:

As adopted, 31 FR 14808 (Nov. 22, 1966), and amended at 32 FR 5258 (Mar. 29, 1967), and corrected at 32 FR 7126 (May 11, 1967); recodified as 42 CFR 405.420 (formerly 20 CFR 405.420) at 42 FR 52826 (Sept. 30, 1977, effective Oct. 1, 1977), and amended at 47 FR 43656 (Oct. 1, 1982, effective with respect to all costs incurred under Medicare, both before and after enactment of PubLNo 97-248, except those specific costs allowed under court order in *Presbyterian Hospital of Dallas v. Harris*), and redesignated at 51 FR 34790 (Sept. 30, 1986, effective Oct. 1, 1986), and amended at 57 FR 33878 (July 31, 1992, effective Aug. 31, 1992), at 60 FR 63124 (Dec. 8, 1995, effective Jan. 1, 1996), at 63 FR 40953 (July 31, 1998, effective Oct. 1, 1998), and at 66 FR 32171 (June 13, 2001), and redesignated from §413.80 at 69 FR 48916 (Aug. 11, 2004, effective Oct. 1, 2004), and amended at 71 FR 47870 (Aug. 1, 2006, effective Oct. 1, 2006), at 71 FR 69624 (Dec. 1, 2006, effective Jan. 1, 2007), and at 75 FR 49030 (Aug. 12, 2010, effective Jan. 1, 2011).